

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-14-00162-CR

DENETRA MARIE HARRIS, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the County Court at Law No. 1
Gregg County, Texas
Trial Court No. 2014-0382

Before Morriss, C.J., Moseley and Burgess, JJ.
Opinion by Justice Burgess

O P I N I O N

Denetra Marie Harris was arrested on outstanding warrants after she was stopped for a defective brake light. During the subsequent search of Harris' vehicle, a Texas Department of Public Safety (TDPS) trooper found a non-prescription pill bottle containing the prescription medication Xanax. This led to Harris' conviction of possession of a controlled substance. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.117 (West 2010). Harris challenges that conviction on appeal by contesting the lawfulness of the search of her vehicle. We find that the search of Harris' vehicle was lawful and therefore affirm her conviction. We further find that there is sufficient evidence to support the trial court's finding that Harris was not indigent. Finally, we find that Harris failed to preserve her complaint regarding the trial court's order that she pay court-appointed attorneys fees as a condition of her appeal bond. Consequently, we affirm the trial court's judgment.

I.      **The Initial Traffic Stop and Subsequent Search of Harris' Vehicle**

TDPS Trooper Michael Player stopped Harris' car about 2:00 a.m. on January 11, 2014, because one of the brake lights was not illuminating and another was malfunctioning. When Player made contact with Harris, she admitted that she had neither a valid driver's license nor insurance. Player also smelled strong odors of alcohol and burnt marihuana coming from Harris' vehicle. Player had Harris join him in his patrol car while he contacted dispatch to review her identifying information. When informed that Harris had two outstanding arrest warrants, Player arrested her.

Harris' passenger did not have a valid driver's license and could not drive the vehicle home. Accordingly, Player called for a tow truck and impounded the vehicle. While performing a search

of the vehicle's contents, Player located a bottle containing Xanax, which resulted in Harris' conviction of possession of a controlled substance. On appeal, Harris challenges the propriety of the search of her vehicle.

Player's interaction with Harris and her passenger was recorded by his patrol vehicle's dashboard camera (dash cam), and that audio/video recording was admitted into evidence at trial. The dash cam recording demonstrates that, after interacting with Player for approximately four minutes, Harris admitted that she had consumed alcohol about five hours earlier and that she had smoked marihuana in the vehicle the previous day. These admissions confirmed Player's belief that he smelled these intoxicants when he first approached Harris' vehicle. About eight minutes after initiating the stop, Player announced his intention to search the car based on the odor of marihuana and Harris' admission that she had used the controlled substance. Two and one half minutes later, the dispatcher informed Player that Harris had outstanding arrest warrants, and Player arrested her. She was handcuffed and placed in the front seat of Player's patrol car.

Player asked the passenger if he had access to any licensed driver who could retrieve the vehicle, and the passenger said that he did not. Player then told Harris he could not release the car to her passenger because the passenger did not have a driver's license. Approximately three minutes after Player arrested Harris, he called dispatch and requested a tow truck. Shortly thereafter, Player searched the car and found an Advil bottle containing Xanax. Player next asked the passenger if he had any belongings in Harris' car and advised him that the car was about to be towed. Player then informed Harris that in addition to her arrest on outstanding warrants, she was also being arrested for unlawfully possessing the controlled substance Xanax. Harris moved to

3

suppress the evidence from the search, arguing to the trial court that the search was an unreasonable warrantless search. The trial court denied Harris' motion to suppress evidence.

## II.     Probable Cause to Search the Vehicle

### A.     Standard of Review

"In a hearing on a motion to suppress evidence, a defendant bears the initial burden of proof to demonstrate that the search and seizure occurred without a warrant." *Hitchcock v. State*, 118 S.W.3d 844, 848 (Tex. App.—Texarkana 2003, pet. ref'd) (citing *Bishop v. State*, 85 S.W.3d 819, 821 (Tex. Crim. App. 2002)). Once the defendant demonstrates that a warrantless search occurred, the burden shifts to the State to prove that a warrant existed or that an exception, under either the Fourth Amendment to the United States Constitution or Article I, Section 9, of the Texas Constitution, justified the warrantless search given the totality of the circumstances. *State v. Steelman*, 93 S.W.3d 102, 106 n.5 (Tex. Crim. App. 2002); *Bishop*, 85 S.W.3d at 822; *Hitchcock*, 118 S.W.3d at 848. If clear and convincing proof satisfying the State's burden is not offered before the trial court, then the illegally obtained evidence may not be admitted at trial. *See State v. Ibarra*, 953 S.W.2d 242, 245 (Tex. Crim. App. 1997) (Mansfield, J., concurring); *Hitchcock*, 118 S.W.3d at 848. In the present case, the parties agree that the search in question was executed without a warrant. Consequently, the State was required to prove the existence of a valid exception to the Fourth Amendment.

The standard of review for the trial court's ruling on a motion to suppress is abuse of discretion. *Oles v. State*, 993 S.W.2d 103, 106 (Tex. Crim. App. 1999); *Freeman v. State*, 62 S.W.3d 883 (Tex. App.—Texarkana 2001, pet. ref'd). "In a suppression hearing, the trial court is

the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony." *State v. Ballard*, 987 S.W.2d 889, 891 (Tex. Crim. App. 1999). The evidence should be viewed "in the light most favorable to the trial court's ruling." *Id.*; *Freeman*, 62 S.W.3d at 886. We "'should afford almost total deference to a trial court's determination of the historical facts that the record supports[,] especially when the trial court's fact findings are based on an evaluation of credibility and demeanor.'" *State v. Ross*, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000) (quoting *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)); *see Freeman*, 62 S.W.3d at 886.

We review "de novo the [trial] court's application of the law of search and seizure to those facts." *Ross*, 32 S.W.3d at 856. Further, when the trial court does not file findings of fact, we should assume the trial court made implicit findings that support its ruling, so long as those implied findings are supported by the record. *Id.* at 855. If the trial court's decision is correct on any theory of law applicable to the case, we should affirm the decision. *See id.* at 856; *Maysonet v. State*, 91 S.W.3d 365, 369 (Tex. App.—Texarkana 2002, pet. ref'd).

### B. Player Had Probable Cause to Search Harris' Vehicle

The United States Supreme Court has held that "in cases where there was probable cause to search a vehicle[,] 'a search is not unreasonable if based on facts that would justify the issuance of a warrant, even though a warrant has not actually been obtained.'" *Maryland v. Dyson*, 527 U.S. 465, 467 (1999) (per curiam) (citing *United States v. Ross*, 456 U.S. 798, 809 (1982)). In *Arizona v. Gant*, the United States Supreme Court ruled that once a defendant is arrested and secured in a patrol car, the arresting officer cannot justify a vehicle search as a search incident to arrest, but it reaffirmed its holding in *Ross* that "[i]f there is probable cause to believe a vehicle

5

contains evidence of criminal activity, . . . *Ross* . . . authorizes a search of any area of the vehicle in which the evidence might be found." *Arizona v. Gant*, 556 U.S. 332, 346–47 (2009). The Supreme Court went on to hold that "*Ross* allows searches for evidence relevant to the offenses other than the offense of arrest, and the scope of the search authorized is broader." *Id.* at 347.

Similarly, the Texas Court of Criminal Appeals has stated,

"Probable cause for a search exists where the facts and circumstances within the knowledge of the officer on the scene and of which he has reasonably trustworthy information would lead a man of reasonable caution and prudence to believe that he will find the instrumentality of a crime or evidence pertaining to a crime."

*Moulden v. State*, 576 S.W.2d 817, 819 (Tex. Crim. App. [Panel Op.] 1978) (quoting *Brown v. State*, 481 S.W.2d 106, 110 (Tex. Crim. App. 1972)). In *Parker v. State*, the Texas Court of Criminal Appeals held that "if [an] [o]fficer . . . makes a traffic stop and, when the driver rolls down his window, the redolent odor of burnt marihuana wafts out, he may well have probable cause to believe that the person (or persons) inside that small, enclosed area has been or is committing the offense of possession of marihuana." *Parker v. State*, 206 S.W.3d 593, 597 n.11 (Tex. Crim. App. 2006) (citing *Moulden*, 576 S.W.2d at 818 (holding "the odor of burnt marihuana, standing alone" "provide[d] . . . peace officer[s] with the requisite probable cause to conduct a warrantless search of [the defendant's] vehicle.")). Moreover, in *Jordan v. State*, the Court of Appeals held that "'the odor of [marihuana] alone is sufficient to constitute probable cause to *search a defendant's person*, vehicle or objects within the vehicle.'" *Jordan v. State*, 394 S.W.3d 58, 64 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd) (quoting *Johnson v. State*, No. 01-10-00124-CR, 2011 WL 5428969, at *9 n.10 (Tex. App.—Houston [1st Dist.] Nov. 10, 2011, pet. ref'd) (mem. op., not designated for publication)).

6

In the present case, Player not only smelled marihuana emitting from Harris' vehicle, he also smelled alcohol in the vehicle and on her person. Upon initial questioning, Harris admitted that she had used both recently. Clearly, these facts "would lead a man of reasonable caution and prudence to believe that he will find the instrumentality of a crime or evidence pertaining to a crime." *Moulden*, 576 S.W.2d at 818. Thus, at that point, Player had probable cause to search Harris' car, including "objects within the vehicle." *See Jordan*, 394 S.W.3d at 64.

### C. Player's Search Was Justified as a Valid Inventory Search

Law enforcement officers may impound a vehicle and inventory its contents when "the driver is removed from [her] automobile and placed under custodial arrest and no other alternatives are available other than impoundment to insure the protection of the vehicle." *Delgado v. State*, 718 S.W.2d 718, 721 (Tex. Crim. App. 1986). It is the State's burden to prove that impoundment was reasonable, but "[t]he police need not independently investigate possible alternatives to impoundment absent some objectively demonstrable evidence that alternatives did, in fact, exist." *Mayberry v. State*, 830 S.W.2d 176, 180 (Tex. App.—Dallas 1992, pet. ref'd). Rather, "Texas courts have generally found impoundment to be reasonable when the driver was alone when arrested or when passengers could not show they were licensed drivers." *Yaws v. State*, 38 S.W.3d 720, 724 (Tex. App.—Texarkana 2001, pet. ref'd) (citing *Stephen v. State*, 677 S.W.2d 42, 43–44 (Tex. Crim. App. 1984)).

Upon impounding a vehicle, law enforcement may secure the vehicle and inventory its contents. *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976). This inventory "must be conducted in good faith and pursuant to reasonable standardized police procedure." *Moskey v.*

*State*, 333 S.W.3d 696, 700 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (citing *Colorado v. Bertine*, 479 U.S. 367, 374 (1987)). The inventory must not be a pretext or a ruse to generally explore or rummage through the vehicle. *See Richards v. State*, 150 S.W.3d 762, 771 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd) (en banc). The State must establish that the inventory search was lawful. *Moskey*, 333 S.W.3d at 700.

Harris first argues that Player's search of her vehicle was not a valid inventory search because Player had already made the decision to search the vehicle before he made the decision to impound it. Therefore, according to Harris, the inventory was merely a pretext for an investigative search of her vehicle. Yet, as noted above, Player had probable cause to search the vehicle upon detecting the odor of marihuana. His initial statement that he intended to search the car occurred after developing that probable cause. Subsequently, after determining that no other driver was available to retrieve the vehicle, Player decided to impound the car and called for a tow truck to transport it. At that time, Player had justification to enter the vehicle in order to inventory its contents in addition to the probable cause he had developed earlier. Consequently, Player's search of her vehicle was justified as an inventory search.

Harris also asserts that the State failed to prove that the TDPS had a standardized vehicle inventory policy or that Player followed any such policy. The United States Supreme Court has held that "the policy or practice governing inventory searches should be designed to produce an inventory. The individual police officer must not be allowed so much latitude that inventory searches are turned into 'a purposeful and general means of discovering evidence of crime.'" *Florida v. Wells*, 495 U.S. 1, 4 (1990) (quoting *Bertine*, 479 U.S. at 372). Nevertheless, "[t]he

8

State satisf[ies] its burden concerning inventory through the testimony of the officers that (1) an inventory policy existed and (2) that policy was followed." *Evers v. State*, 576 S.W.2d 46, 50 n.5 (Tex. Crim. App. 1978); *see also Mayberry*, 830 S.W.2d at 181 (officer's testimony that he impounded vehicle in accordance with department policy sufficient to show existence of and officer's adherence to inventory search policy). If, after the State makes these showings, a defendant wishes "to appeal the policy or alleged deviation from that policy, then [she] must develop the record." *Evers*, 576 S.W.2d at 50 n.5; *see also Mayberry*, 830 S.W.2d at 181 ("If appellant wanted to inquire about the substance of this policy and raise specific questions regarding its validity, he was free to do so. In the absence of any evidence to the contrary, we conclude that this testimony was sufficient to establish departmental policy.").

Player testified that he opened every container in Harris' car during the search, although he could not recall at the time of trial precisely what containers those were. When asked on examination by Harris' attorney whether TDPS policy was to open all containers inside a vehicle during an inventory search, Player refused to quote the policy without first reviewing it in written form, yet he stated that he knew the TDPS policy. On examination by the State's attorney, Player testified that he inventoried Harris' vehicle, that he conducted the inventory according to TDPS standard inventory policy, and that he did not deviate from the procedure set out in that policy. This is sufficient evidence to establish the existence of and Player's compliance with a department policy regarding inventory searches.

Accordingly, the search of Harris' vehicle was valid under the Fourth Amendment, and the trial court did not err in denying Harris' motion to suppress the evidence obtained through that search.

**III.** **Points of Error Related to Assessment of Attorney Fees Against Harris**

    **A.** **Harris Failed to Preserve her Claim that the Trial Court Erred in Imposing Attorney Fees as a Condition of her Appeal Bond**

Harris complains in her third point of error that the trial court lacked authority to condition her appeal bond on her repayment of the fees charged by her appointed trial counsel. In her fourth point of error, Harris claims that there was insufficient evidence to support the trial court's finding that she was not indigent. Because these two points of error are interrelated, we will address them together. As a preliminary matter, we must determine whether Harris preserved these claims of error for appellate review. For the reasons set forth below, we find that Harris failed to preserve her third point of error for our review because she did not raise this issue in the trial court, but that Harris can raise her fourth point of error notwithstanding her failure to object at trial because her challenge is to the legal sufficiency of the evidence supporting the trial court's finding.

Because bail after conviction is not a constitutional right, conditions imposed as part of an appeal bond need only be reasonable; they do not need "to secure a defendant's attendance at trial" or "be related to safety of the alleged victim or the community." *Ex parte Anderer*, 61 S.W.3d 398, 401–02, 406 (Tex. Crim. App. 2001). Nevertheless, a complaint regarding an appeal bond condition must be challenged in the trial court to preserve it for appeal. TEX. R. APP. P. 33.1(a); *Ex parte McClendon*, 356 S.W.3d 541, 542 (Tex. App.—Texarkana 2011, no pet.). In *McClendon*, we found that the appellant failed to preserve her objection to the trial court's imposition of weekly

drug testing as a condition of her appeal bond. *McClendon*, 356 S.W.3d at 542; *see also Margoitta v. State*, 994 S.W.2d 336, 338–39 (Tex. App.—Waco 1999, no pet.); *Hill v. State*, 902 S.W.2d 57, 60 (Tex. App.—Houston [1st Dist.] 1995, pet. ref'd). By failing to raise in the trial court her claim that the trial court lacked legal authority to condition an appeal bond on her payment of the fees of her appointed trial counsel, Harris waived her third point of error.

On the other hand, the Court of Criminal Appeals has held that in certain circumstances, an appellant can challenge for the first time on appeal a trial court's order requiring a defendant to pay the fees of appointed trial counsel. The assessment of the attorney fees against a criminal defendant requires a finding that the defendant has the means, financially, of paying the assessed costs, and that finding must be supported by sufficient record evidence. *See* TEX. CODE CRIM. PROC. ANN. art. 26.05(g) (West Supp. 2014); *Wolfe v. State*, 377 S.W.3d 141, 144 (Tex. App.— Amarillo 2012, no pet.); *see also Mayer v. State*, 309 S.W.3d 552, 556 (Tex. Crim. App. 2010). In *Mayer*, the court held that "'[a] claim regarding sufficiency of the evidence need not be preserved for review at the trial level and is not waived by the failure to do so.'" *Mayer*, 309 S.W.3d at 555 (quoting *Rankin v. State*, 46 S.W.3d 899, 901 (Tex. Crim. App. 2001)). Because an appellant can raise a legal sufficiency challenge on appeal without first raising it in the trial court, we must address whether there is sufficient evidence before us to support the trial court's finding that Harris was not indigent and that she was financially able to pay a portion of the fees of her appointed trial counsel.[1]

---

[1]Harris does not challenge the trial court's legal authority to require the payment of attorney fees generally. Clearly, a trial court has that legal authority. Article 26.05(g) of the Texas Code of Criminal Procedure states:

**B.** **Sufficient Evidence Supports the Trial Court's Finding that Harris Was Not Indigent and Was Financially Able to Pay Attorney's Fees**

When a defendant makes a prima facie showing of indigence, it falls to the State "to show that the defendant is not in fact indigent." *Whitehead v. State*, 130 S.W.3d 866, 874 (Tex. Crim. App. 2004). In this case, the trial court held a hearing to set Harris' appeal bond and to determine her indigence status. After a thorough examination of the evidence, the trial court found that Harris was "capable of contributing to the cost of court-appointed counsel during the pendency of this case." Nevertheless, the trial court appointed counsel to represent Harris on appeal in "the interests of justice."[2] Thus, while the trial court did not find Harris indigent, the court did appoint appellate counsel to represent Harris on appeal. In her fourth point of error, Harris challenges the sufficiency

---

If the court determines that a defendant has financial resources that enable him to offset in part or in whole the costs of the legal services provided, including any expenses and costs, the court shall order the defendant to pay during the pendency of the charges or, if convicted, as court costs the amount that it finds the defendant is able to pay.

TEX. CODE CRIM. PROC. ANN. art. 26.05(g). What Harris challenges in her third point of error is the trial court's legal authority to make reimbursement of those costs a condition of her appeal bond such that a failure to make the required payments would justify revocation of that bond. By failing to raise that objection in the trial court below, Harris has waived her third point of error for appeal. Nevertheless, even though there is no issue before us concerning the trial court's legal authority to impose the costs and to make payment of the costs a condition of Harris' appeal bond, there must still be sufficient evidence to support the trial court's finding that Harris was not indigent and was able to pay the costs ordered, regardless of whether the matter was raised in the trial court below. Thus, even though she waived her third point of error, we must still consider her fourth point of error.

[2]Harris submitted a request for the appointment of appellate counsel on a form that appears to have been provided by the trial court. The form is divided into two sections by headings. The heading for the top section reads, "REQUEST FOR APPOINTMENT OF COUNSEL," and the heading for the bottom sections reads, "ORDER APPOINTING COUNSEL." Under the heading "ORDER APPOINTING COUNSEL," the form reads, "On this _____ day of _____, 20____, the Court having determined that the defendant is (circle one) indigent or the interests of justice require." Following that is a blank space to insert the name of the attorney being appointed and some boilerplate language regarding the scope and duration of the appointment. Finally, there is a blank space for the appointing judge's signature. The same form was completed before Harris' trial. In both instances—for trial and for appeal—the trial court appointed counsel to represent Harris, but indicated on the form that the appointment was made in the interests of justice rather than because Harris was indigent.

12

of the evidence supporting the trial court's finding that she is not indigent and argues that the State failed to rebut the presumption of indigence.

The Texas Court of Criminal Appeals has established a two-step process for determining indigence:

> First, the defendant must make a prima facie showing of indigency. Once the defendant satisfies this initial burden of production, the burden then shifts to the State to show that the defendant is not, in fact, indigent. This means, essentially, that unless there is some basis in the record to find the defendant's prima facie showing to be inaccurate or untrue, the trial court should accept it as sufficient to find him indigent. After a defendant establishes a prima facie showing of indigency, "an appellate court can uphold a trial court's determination of non-indigence only if the record contains evidence supporting such a determination."

*McFatridge v. State*, 309 S.W.3d 1, 5–6 (Tex. Crim. App. 2010) (footnotes omitted) (quoting *Whitehead*, 130 S.W.3d at 874). Although the Court of Criminal Appeals has suggested that a trial court is entitled to some deference in its indigence determinations,[3] "the trial court does not have the nearly unfettered discretion seen in other contexts to simply disbelieve the defendant's evidence of indigence." *Whitehead*, 130 S.W.3d at 875. In *Snoke v. State*, 780 S.W.2d 210, 212 (Tex. Crim. App. 1989) (per curiam), the court reversed a finding that the appellant was not indigent even though the evidence established that at some time before the appeal, the appellant had notable assets and access to cash:

> The effect of [the court of appeals'] holding is that an appellant who admits that he used to have money can be held not to be indigent if the trial court does not believe his uncorroborated testimony that he has spent it all for valid debts, even where there is no positive evidence that he still has money, or that he fraudulently diverted his former assets.

---

[3]*See McFatridge*, 309 S.W.3d at 7–8 (reviewing trial court's ruling for abuse of discretion); *Whitehead*, 130 S.W.3d at 874–76.

13

*Id*. at 214. Where a defendant makes a prima facie showing of indigence, this "suggests that a trial court should accept the defendant's evidence absent some reason in the record for not doing so." *Whitehead*, 130 S.W.3d at 875. The trial court may ask the defendant to "verify his claim of indigence with supporting documentation," and if the court "does not request verification, then the defendant's sworn allegations should be accepted unless the allegations are suspect in a manner that verification would not remedy." *Id*.

In *Whitehead*, the defendant had retained counsel at trial. Following Whitehead's conviction, his trial counsel moved to withdraw, asked that appellate counsel be appointed, and asked that Whitehead be provided a free copy of the appellate record.[4] *Whitehead*, 130 S.W.3d at 869–70. The record revealed that Whitehead had access to "substantial amounts of money,"[5] and even though she posited that she had a negative net worth, the court observed that "a negative net worth is by no means determinative. . . . [A]n individual's negative net worth does not necessarily translate into indigence; the real question is whether the defendant is capable of paying for legal counsel and for the appellate record." *Id*. at 878. Even though Whitehead had submitted evidence of debts, the Court of Criminal Appeals noted that a loan of $111,500.00 was from a relative and that there was no evidence regarding the purpose for the loan. Thus, according to the Court of Criminal Appeals, "The trial court could have reasonably believed the loan did not have to be

---

[4]An affidavit from the court reporter in *Whitehead* indicated that the reporter's record was approximately 13,000 pages long and that the charge for preparing the record would be about $65,000.000, exclusive of exhibits. *Whitehead*, 130 S.W.3d at 870. Whitehead was convicted of theft, but notwithstanding the voluminous record, the nature and extent of this theft remains a mystery.

[5]More specifically, the evidence showed that Whitehead had "$5,000 cash in bank accounts, over $1,600 in investments, two cars totaling $6,800[,] . . . $10,000 worth of equity in her home," and "a net household income, after all expenses were paid, of $610.38 a month." *Id*. at 878.

repaid right away." *Id.*[6] The court further noted that "[t]he trial court could have reasonably believed that the $65,960.11 litigation debt and the $3,231.09 litigation loan were not immediately payable" and that the expense summary submitted by Whitehead "contained unnecessary items." *Id*. at 878–79. The Court of Criminal Appeals concluded that under these circumstances, "the trial court could reasonably have believed that appellant was not indigent for the purpose of appointing counsel." *Id*.

In the present case, the trial court held a hearing on the appropriate amount of an appeal bond and on Harris' request for the appointment of appellate counsel. The State presented testimony from a Gregg County collections clerk, Mandy Perez, who testified that an individual desiring to set up a payment plan for court costs assessed against them during a criminal proceeding in Gregg County must complete a standardized form. According to Perez, Harris completed this form following her conviction in this matter. Perez testified, "On the first application, [Harris] didn't tell the truth on all the information requested, so I had her fill out a second one." Perez elaborated,

> The first one said she was single, not married, and that she lived with her grandmother -- well, she verbally told me she lived with her grandmother, but the paperwork showed she lived somewhere else. And I asked her about it, because somebody else was in court with her and had told me -- referred to a man as her husband. And I asked her about it, and then in talking with her, I found out she is married. She is not single, and she does not live with her grandmother. She actually lives with her husband.

---

[6] "The ability of the defendant to borrow funds is something that may be taken into account in considering how the defendant's assets and property relate to the ability to pay." *Whitehead*, 130 S.W.3d at 878.

15

Harris told Perez that her husband, Randy Williams, worked for Bolt Oil Field in Kilgore. Harris' application listed the following monthly expenses: $375.00 for rent, approximately $200.00 for electricity, $100.00 for telephone service, $50.00 to $70.00 for water, and about $200.00 for food.[7] According to Perez, Harris stated that her husband paid child support for six children, none of whom were Harris', and that he paid all of Harris' bills. Harris also told Perez that she attended college and received financial aid, including grant money she was due to receive the following month, and that her grandmother helped her financially.

On cross-examination, Perez acknowledged that Harris did not share Williams' name, that Perez had not checked any governmental records to verify Harris' marital status, that she "wouldn't know" if Williams actually gave Harris any money, and that she did not know if Harris had any money or assets. However, Perez also testified that Harris "told me that she has other people that pays her bills, . . . [that] she has somebody paying some traffic tickets that she owes out of another court," and that she would "receive grant money next month, and that's what she lives off of." The trial court then asked, "Were the tickets paid? I know that in this court she was arrested yesterday[8] for tickets, outstanding tickets. Have those tickets been paid?" Perez answered, "No. They were going to wait until this was settled before they paid it," and she explained that "they" meant Harris and her husband. Perez testified that she obtained this information from a female friend or family member who was with Harris during their discussion.

---

[7]We observe that the figures Harris put on her indigence affidavit total slightly more than the $825.00 in monthly expenses.

[8]The hearing on the appeal bond and to address Harris' indigence was held the day after Harris pled guilty and was sentenced.

16

Based on Perez' testimony, the trial court instructed Harris to complete a new affidavit of indigence and form requesting the appointment of counsel. The trial court stated,

> And I'm just going to make some comments about the existing one I have, based on evidence that has been presented to this Court.
>
> In this document that was dated May 23rd, she states she had no automobile. At the time of our suppression hearing, she said that she owned the automobile she was driving when this happened. Now, whether or not she still has it, I don't know, but that needs to be accurate.
>
> She says zero income from a husband,[9] and the issue of husband is very important to this Court, because whether there's a license or it's common law, a spouse, a husband, even a common-law husband has duties to support the spouse, and I would need to know information about the husband's income from the oil-field company. So she needs to complete an accurate application for the Court, and then we're going to resume testimony, okay?

In her second request for appellate counsel and affidavit of indigence, Harris indicated that she had no income and no cash or assets other than a 1993 Honda Accord. She claimed to have unpaid tickets totaling $450.00 or more, and she stated that her monthly expenses totaled $825.00.

Harris testified at the appeal bond hearing. When questioned about her ability to post a bond, Harris stated that her grandmother was paying for her outstanding tickets and that she would be using her school grant money to pay her bond.[10] She testified that she lived with her boyfriend,

---

[9]On the first request for the appointment of counsel and affidavit of indigence, to which the trial court referred, Harris put zeros in the blanks following the phrases "My spouse is _____" and "My spouse's income is _____." On the form she completed on the day of the hearing on her appeal bond, Harris scratched out spouse" on both places, interlined "boyfriend," and completed the form as follows: "My ~~spouse~~ *boyfriend* is <u>*Randy Williams*</u>. My ~~spouse~~ *boyfriend's* income is *Maybe $2,000.00?? per month.*"

[10]At the hearing on Harris' indigence, Harris said she was receiving financial aid in the form of grant money to enable her to attend college.

Randy Williams, but that Perez told her that they were married under Texas common law.[11]  Harris confirmed that she received financial aid in the form of grants to facilitate her attending college and that the money was "for school, you know, for my supplies, books, if I need any clothing for school, that's what it's for. . . . [m]y bills, just pretty much, you know, whatever I need it for."  She testified that she had no bank account, that she was unemployed, and that she received no money from her boyfriend except that "[h]e pays all the bills, so that's where the monies go."  Harris said she had outstanding tickets and fines as well as "surcharges."  She also testified that she planned to use her financial aid grant "to get [her] driver's license situated like [she] need[s] to get it."

On cross-examination, the State asked Harris why she was no longer employed by Church's Chicken as she was when she completed her first request for counsel and affidavit of indigence.  Harris answered, "It was just a lot of mess there, you know, with the females.  And I'm not used to working in that kind of environment. . . . I just can't work in that type of environment.  It's stressful.  You know, I felt like they were always picking on me every day about something."  She said that she had since been looking for a job and that there was no reason she could not work.  Her last employment before her job at Church's Chicken was at a health-care center in 2012.

Harris admitted that she lived with Williams and that he paid her bills.  She also admitted that her grandmother had borrowed money to pay her fines, even though she lived on a fixed income.  Harris did not know how much Williams made, but he paid for her food, shelter, clothing, and utilities.  Harris testified that she and Williams both had vehicles, but she provided no

_____

[11]We express no opinion on whether the requirements of a common-law marriage were proved and do not consider that possibility in determining Harris' indigence status.  *See* TEX. FAM. CODE ANN. § 2.401 (West 2006).

information regarding the number, value, or ownership of the vehicles. She also testified that it was possible for her to use her school grant money to pay attorney fees and court costs.[12]

The trial court also questioned Harris about her car, pointing out that Harris indicated on her first application for appointed counsel that she did not own a car, but at the suppression hearing and at the current hearing, Harris stated that she did. Harris acknowledged that discrepancy, but explained that she had used her financial aid money to buy the car. The trial court then questioned Harris about her educational background and her use of financial aid, revealing doubts about whether she ever used her financial aid for school. Harris could identify no specific courses she had taken and admitted that she did not complete the courses she took. She did testify, however, that she had used her previous financial aid to take an English class, a history course, and "maybe a computer class, if [she could] recollect correctly." She testified that she passed those courses.

Concerning her living arrangement with Williams, Harris testified that she sometimes called Williams her husband and that he sometimes called her his wife. Harris said they had lived

---

[12]The testimony is as follows:

> Q.  [By the State] And the purpose of a grant is to help you cover -- in addition to tuition, books, fees and all that associated with school, depending on the amount you get, it can also be used to help sustain you?
>
> A.  [By Harris] Yes, sir.
>
> Q.  So any money you got above that could also go towards any legal fees that you have right now, right?
>
> A.  It just depends.
>
> Q.  Sure, I mean, if you're going to use some of that money to get your driver's license in order, which is a result of some legal issue, then you could also use that money to cover some of these legal expenses associated with this case, right?
>
> A.  Yes, sir; but, again, it depends.

19

together for seven years and that although she "help[ed] with the bills and stuff at home when [she] ha[d] money," Williams otherwise paid all the bills. The trial court also asked Harris about her employment history during the seven years she had lived with Williams. Her testimony established that she had briefly worked at Church's Chicken making $1,160.00 per month and that she had only worked approximately three of the past seven years. She also admitted that she was capable of working and that because Williams paid the majority of their bills, she had no other financial responsibilities other than to help Williams and pay her fines.

At the conclusion of the hearing, the trial court set Harris' appeal bond at $5,000.00. The trial court noted that Williams "assists [Harris] in support and financial obligations" and that Harris was "capable of employment." Accordingly, the trial court concluded:

> So I find that you are capable of contributing to the cost of court-appointed counsel during the pendency of this case. Now, if that means you get a job, it means you get a job. If that means your Mr. Williams pays for it, whatever, but I find that you are capable of contributing.

The record supports the trial court's finding that Harris was not indigent. Although Harris made a prima facie showing of indigence, the trial court was entitled to disbelieve Harris' allegations because of "conflicting evidence or because the evidence submitted [was] in some manner suspect or determined by the court to be inadequate." *See Whitehead*, 130 S.W.3d at 876. "A reviewing court should uphold a trial court's ruling denying indigent status only if it finds that the trial court, having [used the appropriate test], 'reasonably' believed the defendant was not

indigent." *McFatridge*, 309 S.W.3d at 6 (quoting *Whitehead*, 130 S.W.3d at 879).[13]  Accordingly,

we overrule Harris' fourth point of error.[14]

We affirm the trial court's judgment and sentence.

Ralph K. Burgess
Justice

Date Submitted:     February 23, 2015
Date Decided:       July 31, 2015

Publish

---

[13]*See also Sifford v. State*, 511 S.W.2d 526, 527 (Tex. Crim. App. 1974) (upholding trial court's conclusion that defendant not indigent where there was "evidence in the record to support that finding").

[14]In *White v. State*, 441 S.W.3d 803, 808 (Tex. App.—Texarkana 2014, order), we held that the trial court erred in ruling that the defendant was not indigent. We first noted that "the State presented no evidence to dispute White's evidence as to his income" except to show that he had posted a $10,000.00 surety bond upon conviction and a $1,000.00 surety bond on another charge immediately after he was arrested. *Id.* at 806. We then noted that Article 26.04(m) of the Texas Code of Criminal Procedure prohibits the trial court from considering "'whether the defendant has posted or is capable of posting bail, except to the extent that it reflects the defendant's financial circumstances as measured by the considerations listed in this subsection.'" *Id.* (quoting Tex. Code Crim. Proc. Ann. art. 26.04 (West Supp. 2014)). We further noted that the defendant had "made a prima facie case of indigence, [and] the State failed to meet its burden to show that White was not indigent." *Id.* at 807. Accordingly, in the absence of any evidence to rebut the defendant's prima facie case, other than his ability to make bail, we held that the trial court erred in finding the defendant was not indigent. *Id.* at 808. Here, it is undisputed that Harris made a prima facie showing of indigence, but the State challenged that finding and presented controverting evidence to challenge her indigence. Thus, this case is distinguishable from *White*.

21