

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-15-00155-CR

_____

BOBBY JAY KENNEDY, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 5th District Court
Cass County, Texas
Trial Court No. 2012 F 0232

Before Morriss, C.J., Moseley and Carter,* JJ.
Memorandum Opinion by Justice Carter

_____

*Jack Carter, Justice, Retired, Sitting by Assignment

# MEMORANDUM OPINION

In the early morning hours of July 4, 2012, Bobby Jay Kennedy, a Trooper with the Texas Department of Public Safety (DPS), saw a fourteen-year-old-boy sneaking around in his front yard in an attempt to see his stepdaughter. Kennedy caught the boy, stuck a pistol in his mouth, escorted him into his house, and handcuffed him. During an interview with Kenneth Bond, a Ranger with the Texas Ranger Division of DPS, Kennedy admitted to his actions. A jury ultimately convicted Kennedy of aggravated assault with a deadly weapon. Kennedy was sentenced to two years' imprisonment and was ordered to pay a $10,000.00 fine, but his sentence was suspended, and he was placed on community supervision for five years.

On appeal, Kennedy argues that the trial court erred in failing to suppress his statement to police and in restricting his cross-examination of Bond on the voluntariness of that statement. We find that the trial court did not abuse its discretion in denying the motion to suppress. We further find that Kennedy failed to preserve his second point of error related to the limitation of the scope of his cross-examination of Bond. Accordingly, we affirm the trial court's judgment.

## I. The Trial Court Did Not Abuse its Discretion in Overruling the Motion to Suppress

### A. Standard of Review

Kennedy argues that the trial court erred in overruling his motion to suppress a recorded statement/interview in which he admitted to putting a pistol in the victim's mouth. "The standard of review for the trial court's ruling on a motion to suppress is abuse of discretion." *Harris v. State*, 468 S.W.3d 248, 254 (Tex. App.—Texarkana 2015, no pet.) (citing *Oles v. State*, 993

S.W.2d 103, 106 (Tex. Crim. App. 1999); *Freeman v. State*, 62 S.W.3d 883, 886 (Tex. App.—Texarkana 2001, pet. ref'd)).

"[T]he trial court is the 'sole and exclusive trier of fact and judge of the credibility of the witnesses' and the evidence presented at a hearing on a motion to suppress, particularly where the motion is based on the voluntariness of a confession." *Colvin v. State*, 467 S.W.3d 647, 657 (Tex. App.—Texarkana 2015, pet. ref'd) (alteration in original) (quoting *Delao v. State*, 235 S.W.3d 235, 238 (Tex. Crim. App. 2007)). "Thus, in reviewing the trial court's factual determination of the circumstances surrounding the interrogation, we give almost total deference to the trial court." *Id.* (citing *Martinez v. State*, 348 S.W.3d 919, 922–23 (Tex. Crim. App. 2011)). However, we employ a de novo standard when evaluating whether a reasonable person would have felt free to terminate the questioning and leave because that is a mixed question of law and fact that does not depend on a trial court's credibility determination. *Id.* (citing *Thompson v. Keohane*, 516 U.S. 99, 113–14 (1995); *State v. Saenz*, 411 S.W.3d 488, 490 (Tex. Crim. App. 2013)).

**B.      Grounds for the Motion to Suppress**

Kennedy based his motion to suppress on *Garrity v. New Jersey*, 385 U.S. 493, 496 (1967) and *Miranda v. Arizona*, 384 U.S. 436, 467 (1966). He argued that Bond failed to provide *Garrity* and *Miranda* warnings and that his confession was coerced.[1]

---

[1]While a major portion of Kennedy's appellate brief focuses on *Garrity*, it also mentions *Miranda*, complains of Bond's failure to issue *Miranda* warnings, and interweaves arguments relevant to *Miranda* into the *Garrity* analysis. For example, he points to Bond's failure to issue *Miranda* warnings in support of his position that it was objectively reasonable for him to believe that his employment with DPS could be terminated if he failed to cooperate with Bond's investigation. Out of an abundance of caution, we interpret Kennedy's brief broadly as a challenge to the trial court's rulings on both *Garrity* and *Miranda*.

### 1. Garrity

*Garrity* involved police officers who were under investigation for misconduct. Before being questioned by employees with the office of the Attorney General of New Jersey, each officer was warned "(1) that anything he said might be used against him in any state criminal proceeding; (2) that he had the privilege to refuse to answer if the disclosure would tend to incriminate him; but (3) that if he refused to answer he would be subject to removal from office." *Garrity*, 385 U.S. at 494. The officers answered the questions, and over objection, their answers were used against them in criminal proceedings. *Id.* at 495. The officers argued that their statements were coerced.

The United States Supreme Court framed the Fifth Amendment issue raised by those factual circumstances as whether the officers were "deprived of [their] free choice to admit, to deny, or to refuse to answer" and concluded that they were. *Id.* at 496. The Court reasoned that the choice imposed on the officers "was one between self-incrimination or job forfeiture," which the Court deemed "the antithesis of free choice to speak out or remain silent." *Id.* at 496–97. Finding that the officers were under such pressure as to render them disabled from making a free and rational choice, the Court found that their statements were coerced. *Id.* at 497. It wrote, "[T]he protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office, and . . . it extends to all, whether they are policemen or other members of our body politic." *Id.* at 500.

In his suppression motion, Kennedy argued that he was faced with the same Hobson's choice as the officers in *Garrity* due to the following language in the DPS manual (the Manual):

4

The Department may cause a separate and independent Administrative Inquiry to be conducted into matters concerning an employee's performance, conduct, or fitness for duty. Such Administrative Inquiry may be conducted before a complaint investigation or the filing of a formal complaint.

In any investigation conducted by the Department, either on the basis of a complaint or as an Administrative Inquiry, members of the Department have an obligation to be forthright and straight forward with investigators of the Department . . . [and] shall be completely honest, truthful and straightforward and not attempt in any way to obscure the truth or, through the use of vague, broad, general, nonresponsive, or obstructionist answers, impede or in any way interfere with the Department's ability to ascertain the truth of the matters in question.

The State responded by arguing that *Garrity* did not apply to Kennedy's interview with Bond because Bond was conducting a criminal investigation, not an administrative investigation like the one being conducted in *Garrity*. The State supported its position by reference to the following portions of the Manual:

Nothing in this chapter shall preclude a separate and completely independent criminal investigation of a Department employee who is the subject of an administrative complaint investigation. . . .

Employees who are questioned by a Department investigator during an administrative complaint investigation which involves allegations that could be criminal in nature should be advised that since they are required to fully cooperate and answer all questions posed by the investigator, information obtained from the employee is information which the courts have held is not admissible against that individual in a criminal prosecution arising out of the same set of facts. . . . This is in accordance with the Supreme Court decision in the case of Garrity v. State of New Jersey . . . .

It should be remembered that the provisions of the preceding paragraph apply only in the instances wherein the employee is involved in an administrative complaint investigation or been ordered to cooperate. . . .

It shall be a violation of Department policy for any member of the Department who is engaged in an Administrative Inquiry of a Department employee to divulge to any other person engaged in a criminal investigation of the same Department employee . . . any statement or information derived from a statement made by the Department employee who is the subject of both investigations.

### 2. Miranda

Kennedy also argued that *Miranda* warnings should have been given prior to his interrogation. Custodial interrogation places "'inherently compelling pressures' on the persons interrogated." *Thompson*, 516 U.S. at 107 (quoting *Miranda*, 384 U.S. at 467). Under *Miranda*, "[p]rior to any [custodial] questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney . . . ." *Coffey v. State*, 435 S.W.3d 834, 841 (Tex. App.—Texarkana 2014, pet. ref'd) (quoting *Miranda*, 384 U.S. at 444). "Under both the [f]ederal constitutional standard and the Texas Confession Statute, evidence obtained as a result of a custodial interrogation is inadmissible unless the State proves the officer gave proper warnings and shows an affirmative waiver of rights by the accused." *Id.* at 840–41 (quoting *Hutchison v. State*, 424 S.W.3d 164, 175 (Tex. App.—Texarkana 2014, no pet.)); *see Miranda*, 384 U.S. at 444.

The State responded to Kennedy's motion to suppress by arguing that the interview was noncustodial in nature. The State maintained that the warnings required by *Miranda* are only triggered when a person undergoes custodial interrogation or, in other words, the "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444; *Herrera v. State*, 241 S.W.3d 520 (Tex. Crim. App. 2007). "Article 38.22 constraints on the use of an accused's statements apply only to custodial interrogations." *Colvin*, 467 S.W.3d at 657 (citing *Wolfe v. State*, 917 S.W.2d 270, 282 (Tex. Crim. App. 1996)). "Thus, '[i]f an accused is not in custody when he makes a statement, then the question of voluntariness does not arise.'" *Id.*

(alteration in original) (quoting *Wolfe*, 917 S.W.2d at 270). "Stationhouse questioning does not, in and of itself, constitute custody." *Id.* (quoting *Dowthitt v. State*, 931 S.W.2d 244, 255 (Tex. Crim. App. 1996)).

### C. Evidence at the Suppression Hearing

At the hearing on the motion to suppress, Bond testified that the district attorney's office received a complaint against Kennedy and that he was assigned to conduct a criminal investigation into the "uncorroborated allegations."[2]

Bond informed the trial court that he called Kennedy before the interview to inform him that he was conducting a criminal investigation into an incident that happened at his house on July 4, 2012. When Bond asked Kennedy if he would speak with him, Kennedy met with Bond in person for the interview, which was conducted on July 19, 2012.[3]

Bond freely admitted that he did not issue any *Garrity* or *Miranda* warnings because he "was conducting a non-custodial interview on the criminal investigation." Bond opined that the interview was non-custodial "[b]ecause [Kennedy] was not under arrest and he was free to leave at any time." He also told Kennedy that he was not in any kind of trouble. At the end of the interview, Kennedy left and went back on duty.

---

[2]Bond also testified that the Texas Rangers do not conduct administrative investigations and that the Office of Inspector General (OIG) under DPS's Internal Affairs Department oversees administrative investigations. During cross-examination, Bond testified that DPS conducted an administrative investigation as a result of the same complaint. Bond forwarded a copy of his report to the OIG at their request, adding, "I understand they conducted an administrative investigation after the criminal investigation."

[3]Bond later testified that he did not specifically inform Kennedy that he did not have to speak with him, although he stated that he told Kennedy he was free to leave.

Kennedy initially stated that he did not recall whether Bond had informed him that he was conducting a criminal investigation during their telephone conversation, but later claimed, "I wasn't informed or told that I was under a criminal investigation."[4]  Kennedy testified, "The Ranger explained to me that this was voluntary, per se, but I—as familiar as I am with the DPS General Manual, if you don't cooperate or if you violate one of the ten general orders, then you can be disciplined up to termination."  Kennedy stated that Bond never said that his employment would be terminated if he invoked his Fifth Amendment right.  Yet, when asked if he felt free to ignore Bond's request, Kennedy answered, "Not exactly . . . I felt a bit compelled to go up there and speak to him."  Although Kennedy admitted that he was aware that the interview was non-custodial and that he was free to leave, he also testified, "I did not feel free to leave. . . . I knew if I did leave and wouldn't cooperate with him consequences would come down the chain of command."  When asked if he felt coerced, Kennedy said, "So to speak."

The recording of the interview was played for the trial court.  Boyd began the interview by telling Kennedy that he appreciated Kennedy's decision to engage in the interview, that he was not in any kind of trouble, and that the Rangers investigated allegations involving criminal conduct.  Boyd said, "This is a noncustodial interrogation.  Noncustodial in every way. . . . You're free to leave at any time if you want."  In response to this statement, Kennedy shook his head up

---

[4]Kennedy also testified, "[H]e didn't specifically tell me I was being charged with a crime."  However, at the time of the interview, Kennedy was not formally charged with a crime.

and down and said, "[O]h, yeah," indicating that he understood the noncustodial nature of the interview.[5]

### D.    Trial Court's Findings and Analysis

As a result of *Garrity*, statements made during an administrative investigation in which complete candor is compelled under threat of job loss are inadmissible in a criminal proceeding against the declarant.  Here, Kennedy argues the inverse of *Garrity*—that statements made during a criminal investigation cannot be used against the declarant during criminal proceedings if the defendant subjectively perceives that his job is at risk.  *Garrity* does not stand for this proposition.

In determining that *Garrity* was not implicated, the trial court relied on *United States v. Trevino*, 215 F.App'x 319 (5th Cir. 2007).  In that case, the Fifth Circuit determined that a court must "look at the surrounding circumstances, specifically focusing on whether the questioning was coercive" in order to determine whether the defendant is faced with either making an incriminating statement or being fired.  *Id.* at 322.  The Fifth Circuit noted that Trevino was told that he was free to leave the interrogation room, his supervisors were not present in the room, and no one indicated that his job would be in jeopardy if he failed to cooperate with the investigation.

The same is true here.  In its findings of fact, the trial court determined that Bond was assigned to conduct a criminal investigation, not an administrative one, and that Bond was not a part of the OIG.  The court further found that Bond told Kennedy that his investigation was criminal in nature, that Bond told Kennedy that he was free to leave at any time, and that Bond

---

[5]Kennedy then explained that he retrieved his weapon when he heard his dogs barking, went outside, and saw a head duck down behind his neighbor's truck.  Kennedy admitted that he grabbed the boy and stuck his pistol in the boy's face.  He told Bond that he was trying to protect his family.

never threatened Kennedy with loss of employment. These were factual disputes resolved by the trial court. We give deference to these factual determinations when the findings are supported by evidence in the record. The evidence adduced at the suppression hearing also indicated that Bond's supervisors were not present during the interrogation, that the Manual's mandate for truthful answers applied only to administrative proceedings, and that nothing but Kennedy's subjective belief supported the idea that he could be fired for refusing to answer Bond's questions. Accordingly, we find that the trial court did not abuse its discretion in concluding that Kennedy was not "deprived of his free choice to admit, to deny, or to refuse to answer." *Garrity*, 385 U.S. at 496.

Likewise, we also find no abuse of discretion in the trial court's determination that *Miranda* warnings were not required because the interview was noncustodial. One is in custody "only if, under the circumstances, a reasonable person would believe that his freedom of movement was restrained to the degree associated with a formal arrest." *Dowthitt*, 931 S.W.2d at 254. In *Dowthitt*, the Texas Court of Criminal Appeals suggested four scenarios wherein a person might be deemed in custody:

> (1) when the suspect is physically deprived of his freedom of action in any significant way, (2) when a law enforcement officer tells the suspect he cannot leave, (3) when law enforcement officers create a situation that would lead a reasonable person to believe his freedom of movement has been significantly restricted, and (4) when there is probable cause to arrest and law enforcement officers do not tell the suspect he is free to leave.

*Id.* at 255. "[T]he restriction upon freedom of movement [in situations one through three] must amount to the degree associated with an arrest as opposed to an investigative detention." *Id.*

10

Kennedy acknowledged that the interview was "voluntary, per se," although he subjectively felt that he was required to speak with Bond. However, "the custody determination is based entirely upon the objective circumstances"; the subjective intent of the law enforcement officer and of the defendant are "irrelevant except to the extent that they may be manifested in the words or actions of law enforcement officials . . . ." *Id*. at 254. Here, Bond called Kennedy and asked him if he would be willing to speak with him about "uncorroborated allegations" of wrongdoing committed by Kennedy on July 4, 2012. Of his own volition, Kennedy agreed and travelled to meet with Bond. Bond informed him that the interview was noncustodial and that he was free to leave. His freedom of movement was not restrained during the interview. Bond's questioning was conducted in a conversational, non-threatening tone. Kennedy wore his trooper uniform and returned to duty after the short interview. The voluntary and noncustodial nature of Bond's interview "places [Kennedy's] situation outside the scope of *Miranda*." *Salinas v. Tex.*, 133 S.Ct. 2174, 2180 (2013).

Since we conclude that the trial court did not abuse its discretion in finding that Bond was not required to issue *Garrity* and *Miranda* warnings to Kennedy, we overrule Kennedy's first point of error.[6]

---

[6]Furthermore, statements similar to the ones made by Kennedy in his interview were introduced at trial without objection, prior to the introduction of his interview with Bond. Officer Jeb Newkirk, a patrol officer with the City of Atlanta Police Department, responded to the call at Kennedy's home on July 4 and recorded his encounter with Kennedy using his dash-cam. On camera, Kennedy told Newkirk that he held the boy at gunpoint and also said, "I put my Sig [Sauer] in his mouth." Newkirk clarified that Kennedy's statement was an admission to placing his pistol in the boy's mouth. Newkirk testified that Kennedy questioned the boy and said, "Well, I couldn't understand what he was saying with the barrel of my gun in his mouth."

After the jury watched Kennedy's interview with Bond, the boy testified, "[Kennedy] told me to get up and open my mouth. I did it, and he put the gun in my mouth and he grabbed me by the back of the head." The boy also stated that Kennedy walked him across his yard while holding the gun in his mouth.

## II.      Kennedy Did Not Preserve any Issue in Relation to Limitation of Cross-Examination

In his second point of error, Kennedy argues that the trial court's ruling constituted a limitation of his cross-examination of Bond on the issue of voluntariness of his statement. The relevant portion of the transcript from the cross-examination is as follows:

A.      When someone is placed into custody, that's when Miranda applies, yes, sir.

Q.      You've got to read Miranda to anyone -- anyone ever given a Miranda warning in a non-custodial setting?

A.      I'm sure officers do that. As Rangers, we are pretty versed in the 4th amendment and 5th and 6th amendment, and we try to -- and 38.22, which is in the Code of Criminal Procedures under Written Statements, and if it's non-custodial, then generally I know that I was taught not to Mirandize.

Q.      So your governing principle then is 38.22, Texas Code of Criminal Procedure?

A.      Yes, sir. . . .

Q.      In a recorded statement, it's governed by its sister statute, correct?

A.      Yes.

Q.      What would you classify this as being? This would be a recorded statement?

A.      This would be a non-custodial recorded interview.

Q.      So would 38.23 or 38.22 be applicable here?

A.      No, sir.

Q.      Neither?

A.      No, sir.

Q.      I mean what does control in this sort of situation?

12

A.     He wasn't in custody.

Q.     Are all 38.22 statement recordings absolutely in custodial?

A.     Yes, sir.

Q.     Every one?

A.     Custodial, and if an interrogation occurs at the time. And in this one, it did.

Q.     Ranger, is it your testimony that there has never been a non-custodial statement taken under either 38.22 or 38.23?

A.     I know from my interpretation of 38.22, Miranda does not apply in a non-custodial setting.

Q.     Okay.  Well, then, does 38.22 apply, Ranger?  I'm not trying to argue with you but –

[BY THE STATE]:    Your Honor, I believe that's been asked and answered.

[BY THE DEFENSE]:        I don't believe it's been answered.

THE COURT:        Counsel approach.

(The following conference at the bench)
(Out of the hearing of the jury)

THE COURT:  You're asking him about the law.  The court has already ruled on that.  I'm not sure why you're asking him that.  Where are you going?  It's a non-custodial investigation.

[BY THE DEFENSE]:  Because we are still entitled to raise the issue of voluntariness of any statement given within the context of submitting it to the jury.

THE COURT:  This does effect the –

[BY THE DEFENSE]: Well, Your Honor, I will develop this more fully to make it clear. The written policies of DPS are exactly the option of --

THE COURT: That's not what you're asking. You're asking him about Ranger warnings under 38.22 and 38.23.

[BY THE DEFENSE]: He just testified that 38.22 is what controls. I'm only responding to what he's answered. I didn't bring up 38.22, he did.

THE COURT: He brought up the prior warnings. This is not the issue you seem to be trying to argue.

[BY THE DEFENSE]: I tried to elicit from him the way this time -- can we do this out of the presence of the jury?

THE COURT: Yes. The objection is sustained. The question was asked and answered. I want you to be careful when you –

[BY THE DEFENSE]: Your Honor, before we let the jury go at the end of the case, I want to make a bill, and I'll do it more clearly.

THE COURT: That's fine. You may proceed.

From this portion of the transcript, it is clear that Bond had already testified that he did not believe that Texas Code of Criminal Procedure, Articles 38.22 and 38.23, applied. On this record, it appears that the trial court was preventing counsel from attempting to elicit cumulative testimony. Accordingly, we do not find that the trial court's ruling specifically limited Kennedy's cross-examination on the issue of voluntariness.

Nevertheless, Kennedy argues that "the trial court instructed the Appellant's counsel to disengage his line of questioning when it was clear that the questioning was going to establish a factual dispute as to the voluntariness of the Appellant's statement." Even if we determined that counsel's questions could be interpreted as an inquiry into the voluntariness of Kennedy's statement, the issue was not preserved.

14

"[W]hen an accused desires to elicit certain specific responses from a State's witness but is precluded from doing so by the trial judge, the record must contain an offer of proof in order to preserve error." *Franklin v. State*, 459 S.W.3d 670, 679 (Tex. App.—Texarkana 2015, pet. ref'd) (citing *Duke v. State*, 365 S.W.3d 722, 725 (Tex. App.—Texarkana 2012, pet. ref'd); TEX. R. EVID. 103(a)(2)). An offer of proof allows a trial judge to reconsider his ruling in light of the evidence elicited and also enables an appellate court to determine whether the evidence should have been allowed. *Id.* (citing *Mays v. State*, 285 S.W.3d 884, 890 (Tex. Crim. App. 2009)).

Although Kennedy informed the trial court that he would "make a bill," the bill of exception made by counsel failed to mention Bond or the alleged limitation of his cross-examination and did not include either a suggestion of the questions counsel wished to ask of Bond or Bond's likely answers to those questions. "When . . . there is no bill of exception or offer of proof to show the facts the defendant could have proved through cross-examination of an adverse witness, the issue has not been preserved for appellate review." *Id.* (quoting *Lewis v. State*, 126 S.W.3d 572, 579 (Tex. App.—Texarkana 2004, pet. ref'd)). Because it is unclear what further cross-examination of Bond would have yielded, Kennedy has failed to preserve his second point of error for our review.

## III.    Conclusion

We affirm the trial court's judgment.


                                              Jack Carter
                                              Justice


Date Submitted:     August 17, 2016
Date Decided:       September 27, 2016

Do Not Publish