**Rodney BOYETT, Appellant**

v.

**The STATE of Texas, Appellee**

No. 06–15–00024–CR

Court of Appeals of Texas, Texarkana.

Submitted: December 3, 2015

Decided: February 2, 2016

Michael Mowla, Michael Mowla, PLLC, Cedar Hill, TX, for appellant

Gary D. Young, Lamar County & District Attorney, Paris, TX, for appellee

Before Morriss, C.J., Moseley and Burgess, JJ.

## OPINION

Opinion by Justice Burgess

Rodney Boyett pled guilty to and was convicted of conspiracy to manufacture methamphetamine in an amount of one gram or more but less than four grams. Boyett was sentenced to five years' imprisonment and was ordered to pay a $500.00 fine. However, in accordance with the terms of his negotiated plea agreement, Boyett's sentence was suspended, and he was placed on community supervision for three years.

On appeal, Boyett argues (1) that the trial court erred in overruling his motion to suppress evidence because the arresting officer did not have reasonable suspicion to make a *Terry*[1] stop or probable cause to search his vehicle and (2) that the trial court erred in overruling his motion to suppress allegedly coerced statements made during a subsequent custodial interrogation. We find no abuse of discretion in the trial court's denial of Boyett's motion to suppress. In his last point of error, Boyett argues that his guilty plea was not supported by legally sufficient evidence. The trial court did not grant Boyett permission to appeal his sufficiency issue. Accordingly, we dismiss Boyett's challenge to the sufficiency of the evidence for want of jurisdiction, overrule Boyett's remaining points of error, and affirm the trial court's judgment.

## I. The Trial Court Did Not Abuse Its Discretion in Concluding that Foreman Had Reasonable Suspicion to Stop Boyett and Probable Cause to Search his Truck

### A. Standard of Review

"The standard of review for the trial court's ruling on a motion to suppress is abuse of discretion." *Harris v. State*, 468 S.W.3d 248, 254 (Tex.App.–Texarkana 2015, no pet.) (citing *Oles v. State*, 993 S.W.2d 103, 106 (Tex.Crim.App.1999); *Freeman v. State*, 62 S.W.3d 883, 886 (Tex. App.–Texarkana 2001, pet. ref'd)). " 'In a suppression hearing, the trial court is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony.' " *Id.* (quoting *State v. Ballard*, 987 S.W.2d 889, 891 (Tex. Crim.App.1999)). Thus, "[w]e ' "should afford almost total deference to a trial court's determination of the historical facts that the record supports[,] especially when

1. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

the trial court's fact findings are based on an evaluation of credibility and demeanor." ' " *Id.* (quoting *State v. Ross*, 32 S.W.3d 853, 856 (Tex.Crim.App.2000) (quoting *Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App.1997))). However, "[w]e review 'de novo the [trial] court's application of the law of search and seizure to those facts.' " *Id.* (quoting *Ross*, 32 S.W.3d at 856). "The evidence should be viewed 'in the light most favorable to the trial court's ruling.' " *Id.* (quoting *Ballard*, 987 S.W.2d at 891; *Freeman*, 62 S.W.3d at 886).

 " 'In a hearing on a motion to suppress evidence, a defendant bears the initial burden of proof to demonstrate that the search and seizure occurred without a warrant.' " *Id.* at 254 (quoting *Hitchcock v. State*, 118 S.W.3d 844, 848 (Tex.App.– Texarkana 2003, pet. ref'd) (citing *Bishop v. State*, 85 S.W.3d 819, 821 (Tex.Crim. App.2002))). "Once the defendant demonstrates that a warrantless search occurred, the burden shifts to the State to prove that a warrant existed or that an exception, under either the Fourth Amendment to the United States Constitution or Article I, Section 9, of the Texas Constitution, justified the warrantless search given the totality of the circumstances." *Id.* (citing *State v. Steelman*, 93 S.W.3d 102, 106 n. 5 (Tex. Crim.App.2002); *Bishop*, 85 S.W.3d at 822; *Hitchcock*, 118 S.W.3d at 848). In the present case, the parties agree that the search in question was executed without a warrant. Consequently, the State was required to prove the existence of a valid exception to the Fourth Amendment.

## B. Evidence Presented at the Hearing on Boyett's Motion to Suppress Regarding the Circumstances Leading to His Arrest

Boyett and his wife, Jessica Boyett (Jessica), were arrested by Leigh Foreman, an officer with the Paris, Texas, Police Department (Department). Foreman testified about the Department's experience with methamphetamine cooks from Oklahoma making "pill runs." In his experience, people involved in manufacturing methamphetamine in Oklahoma travel to the Paris, Texas, area to buy pseudoephedrine [2] pills to avoid detection by the law enforcement authorities where they live.[3] Foreman testified that in the five years prior to the suppression hearing, he had investigated from ten to twenty such cases. In every one of the cases he investigated, the defendants were from Oklahoma, and all had a similar buying pattern. Namely, two or more people travelling together would each purchase pseudoephedrine at different pharmacies within a very short time period.

Foreman testified that while on patrol in an unmarked vehicle, he was contacted by Lieutenant Anson Amis, who was tasked with monitoring pseudoephedrine purchases in the area. Foreman testified about the computer program used by Amis to monitor pseudoephedrine purchases in Paris as follows:

**2.** Pseudoephedrine is a necessary component to the manufacture of methamphetamine, and the quantity available for sale to an individual purchaser without a prescription is limited to a specific quantity every thirty days. *See* TEX. HEALTH & SAFETY CODE ANN. § 486.014(b)(2) (West Supp.2015) ("A business establishment may not sell to a person who makes over-the-counter purchases of one or more products containing ... pseudoephedrine ... (2) within any 30–day period, more than nine grams of ... pseudoephedrine....").

**3.** We take judicial notice that Paris, Texas, is the county seat of Lamar County and that Lamar County is located on the south bank of the Red River, which separates Texas and Oklahoma.

A. He has a program that monitors—the program itself monitors the purchases of pseudoephedrine. Through that system he is allowed to flag people that he think[s] may or may be suspicious, suspicious buying patterns. He contacted me and stated that Jessica Boyett had just purchased pseudoephedrine at CVS located downtown at 507 Clarksville.

According to Foreman, Amis had the ability to monitor pseudoephedrine purchases in real-time.[4] Foreman explained that Amis told him "that over a period of time he had monitored [the Boyetts'] buying pattern" and "[a]fter observing their buying pattern, he had thought that it was suspicious, and he had flagged them to where he would be notified every time they bought." Amis thought the Boyetts' buying pattern was suspicious because they "had the same address on their drivers['] license[s]," indicating that they were from Rattan, Oklahoma, and had been buying pseudoephedrine "in the Paris area at different pharmacies in a close timeframe together." Based on his experience in investigating such cases, that indicated to Foreman that the Boyetts were being deceptive about purchasing pseudoephedrine.

Foreman testified that on the day he detained the Boyetts, Amis received notice that Jessica had purchased pseudoephedrine at the CVS Pharmacy located at 504 Commerce Street. He asked Foreman to travel to the CVS Pharmacy located at 3710 Lamar Avenue to see if the Boyetts would attempt to purchase pseudoephedrine at that location as well. According to Foreman, Amis provided him with the description of and a license plate number for a pickup truck registered in Rodney Boyett's name. Foreman testified that when they arrived at the CVS Pharmacy on Lamar Avenue, they saw the pickup truck Amis had identified as being registered to Boyett.

After finding Boyett's truck at the CVS Pharmacy, the officers put the Boyetts under surveillance. After leaving the pharmacy, the Boyetts travelled to The Home Depot, where they parked and went inside the store for about ten to twenty minutes. The Boyetts then left The Home Depot and traveled to the nearby Walmart. Foreman noted that Walmart sells other items used in the manufacture of methamphetamine, such as camp fuel, cold packs, liquid heat, coffee filters, rubber tubing, and peroxide. When the Boyetts left the Walmart parking lot, they travelled onto Highway 271, which is the highway that leads back into Oklahoma from Paris. The traffic stop took place on Highway 271. Foreman testified that based on his training and experience investigating pill run cases, people making such runs make other stops at stores such as The Home Depot, Atwoods, Tractor Supply, Walmart, Walgreens, and the two CVS locations to buy the other items necessary to manufacture methamphetamine before returning to Oklahoma.

Foreman testified that in the process of surveilling the Boyetts, he "observed a

---

4. *See* Tex. Health & Safety Code Ann. § 486.0141(a), (d) (West Supp.2015):

 (a) Before completing an over-the-counter sale of a product containing ... pseudoephedrine ... a business establishment that engages in those sales shall transmit the information in the record made under Section 486.014(a)(2) to a real-time electronic logging system.

 . . . .

 (d) On request of the Department of Public Safety, the administrators of a real-time electronic logging system shall make available to the department a copy of each record of an over-the-counter sale of a product containing ... pseudoephedrine ... that is submitted by a business establishment located in this state.

traffic violation where they failed to maintain a single lane" "[i]n about the 1100 block of the northeast loop." He explained, "they were in the right lane, and the vehicles left side tires crossed over the center line into the left lane before going back." After observing this alleged traffic violation, Foreman decided to conduct a traffic stop. However, due to the "really heavy" 5:00 p.m. traffic, Foreman waited to conduct the traffic stop until the Boyetts merged onto the highway that would lead them back to Oklahoma. Amis and Moore also stopped to assist.

After the stop, Foreman approached Boyett, informed him that he was being stopped for failing to maintain a single lane, asked him for identification, and requested that he step out of the vehicle. In response to Foreman's questioning, Boyett stated that he been to CVS, The Home Depot, and Walmart. Foreman testified that Boyett stated that he had purchased pseudoephedrine at Walmart and that he became quiet, nervous, "and sort of hung his head" after being informed that Foreman knew of Boyett and Jessica's purchases of pseudoephedrine at different locations in Paris. According to Foreman, Boyett readily admitted that he used methamphetamine. Foreman further testified, "I asked him if he had any ingredients used for the purpose of manufacturing methamphetamine in the vehicle. He told me that he had liquid heat inside the vehicle." Because he believed he had probable cause to do so, Foreman then conducted a search of the vehicle and found two boxes of pseudoephedrine, liquid heat, rubber tubing, and three bottles of peroxide. Foreman placed Boyett and Jessica under arrest "for possession of cer-

tain chemicals" and transported them to the Paris Police Department.

Boyett testified at the hearing on his motion to suppress. According to Boyett, Foreman pulled him over, informed him that he was being stopped for failing to maintain a single lane, obtained his identification, and then asked whether he used methamphetamine. Boyett stated that he denied using methamphetamine and that he also denied having anything in the car that could be used to make methamphetamine. Boyett testified that despite his answers, Foreman asked him to step out of the vehicle and began searching it without asking for permission or consent.[5]

## C. The Trial Court's Rulings and Boyett's Argument

After the hearing, the trial court denied Boyett's motion to suppress the evidence. In its findings of fact, the trial court determined (1) that Foreman observed "a traffic violation, to-wit: crossing the left hand side of the traffic lane, over toward the center, in heavy traffic" and (2) that Foreman's version of the traffic stop, in which Boyett admitted to using methamphetamine, was true. In his conclusions of law, the trial court determined that the traffic stop was legally conducted and that "[e]ven had [the trial court] determined that Det. Foreman's testimony was insufficient to establish reasonable suspicion and probable cause that Mr. Boyett had committed a traffic violation, Det. Foreman possessed reasonable suspicion to stop" the Boyetts based on his knowledge that they were purchasing items used in the manufacture of methamphetamine.

On appeal, Boyett argues that the stop was illegal because (1) Foreman did not have reasonable suspicion to conduct a

---

**5.** Although three police vehicles were involved in conducting this stop, there is no audio or video recording of the stop.

traffic stop for failing to maintain a single lane as prohibited by Section 545.060 of the Texas Transportation Code, and (2) Foreman did not have reasonable suspicion that Boyett was purchasing items with the intent to manufacture methamphetamine. *See* Tex. Transp. Code Ann. § 545.060 (West 2011).[6] Because we determine that the trial court did not abuse its discretion in finding that Foreman had reasonable suspicion to stop Boyett based on information indicating that he was purchasing items with intent to manufacture methamphetamine, we need not address Boyett's arguments related to the alleged traffic violation. We also conclude that Boyett failed to establish an abuse of discretion in the trial court's determination that Foreman had probable cause to search the truck.

### D. Foreman Had Reasonable Suspicion to Stop the Boyetts

■ Law enforcement officers may stop and briefly detain individuals suspected of criminal activity on less information than is constitutionally required for probable cause to arrest. *Terry*, 392 U.S. at 21, 88 S.Ct. 1868. To make an investigative stop, the officer must possess a reasonable suspicion based on specific, articulable facts that, in light of the officer's experience and general knowledge, would lead the officer to reasonably conclude the person detained actually is, has been, or soon will be engaged in criminal activity. *United States v. Sokolow*, 490 U.S. 1, 7–10, 109

S.Ct. 1581, 104 L.Ed.2d 1 (1989); *Garcia v. State*, 43 S.W.3d 527, 530 (Tex.Crim.App. 2001); *Zervos v. State*, 15 S.W.3d 146, 151 (Tex.App.–Texarkana 2000, pet. ref'd). "This is an objective standard that disregards any subjective intent of the officer making the stop...." *Ford v. State*, 158 S.W.3d 488, 492 (Tex.Crim.App.2005). The facts used to support the investigative stop must support more than a mere hunch or suspicion. *Davis v. State*, 947 S.W.2d 240, 244 (Tex.Crim.App.1997).

■ "In evaluating the validity of a stop such as this, we must consider 'the totality of the circumstances—the whole picture.'" *Sokolow*, 490 U.S. at 8, 109 S.Ct. 1581 (quoting *United State v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)); *see United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). Further, we must be mindful of the following two factors: (1) once a defendant establishes that a search or seizure occurred without a warrant, the burden shifts to the State to establish, by a preponderance of the evidence, the reasonableness of such warrantless search or seizure, and (2) "The use of a preponderance of the evidence standard at trial to determine the existence of 'reasonable suspicion' should not be confused with the 'reasonable suspicion' standard that itself governs the police officer's conduct in the field" because "[r]easonable suspicion that a crime is, has been, or soon will be com-

6. "This statute provides that an operator on a roadway divided into two or more clearly marked lanes for traffic (1) shall drive as nearly as practical entirely within a single lane; and (2) may not move from the lane unless that movement can be made safely." *Bass v. State*, 64 S.W.3d 646, 650 (Tex.App.–Texarkana 2001, pet. ref'd) (citing Tex. Transp. Code Ann. § 545.060(a) (West 2011)). "In other words, a violation of Section 545.060(a) occurs only when a vehicle fails to stay within its lane and that movement is not safe or is not made safely." *Id.* (citing *State v. Cerny*, 28 S.W.3d 796, 800 (Tex.App.–Corpus Christi 2000, no pet.); *Hernandez v. State*, 983 S.W.2d 867, 871 (Tex.App.–Austin 1998, pet. ref'd); *Aviles v. State*, 23 S.W.3d 74, 77 (Tex. App.–Houston [14th Dist.] 2000, pet. ref'd)); *Corbin v. State*, 33 S.W.3d 90, 94 (Tex.App.–Texarkana 2000), *rev'd on other grounds*, 85 S.W.3d 272 (Tex.Crim.App.2002); *see Fowler v. State*, 266 S.W.3d 498, 502 (Tex.App.–Fort Worth 2008, pet. ref'd).

mitted is a standard far short of preponderance of the evidence." *York v. State,* 342 S.W.3d 528, 543 n. 86 (Tex.Crim.App. 2011) (citing *Baldwin v. State,* 278 S.W.3d 367, 371 (Tex.Crim.App.2009)); *see Meadows v. State,* 356 S.W.3d 33, 37 (Tex.App.–Texarkana 2011, no pet.).

▮▮▮▮▮ Also, we do not just look at what the detaining officer knew; rather, in evaluating whether reasonable suspicion exists, "we must evaluate the *collective* information of *all* the officers." *Woodward v. State,* 668 S.W.2d 337, 344 (Tex. Crim.App.1982) (quoting *Wood v. Crouse,* 436 F.2d 1077, 1078 (10th Cir.1971) (per curiam) (emphasis in original)). Thus, "the operative circumstances are not only those known to the officer making the stop or arrest. They include those collectively known by the officers or agents cooperating together at the time of the detention." *State v. Jennings,* 958 S.W.2d 930, 933 (Tex.App.–Amarillo 1997, no pet.); *see also Derichsweiler v. State,* 348 S.W.3d 906, 914 (Tex.Crim.App.2011) ("[T]he detaining officer need not be personally aware of every fact that objectively supports a reasonable suspicion to detain; rather, 'the cumulative information known to the cooperating officers at the time of the stop is to be considered in determining whether reasonable suspicion exists.'") (quoting *Adams v. Williams,* 407 U.S. 143, 147, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *Hoag v. State,* 728 S.W.2d 375, 380 (Tex.Crim.App.1987)); *see McBride v. State,* 946 S.W.2d 100, 102 (Tex.App.–Texarkana 1997, pet. ref'd) ("When several officers are cooperating, their cumulative information is to be considered in determining whether reasonable suspicion exists at the time of the stop in connection with a subsequent search."). Accordingly,

both the trial and reviewing courts must proceed cautiously when it appears that the detaining officer acted upon *nothing other than* a radio dispatch or request to apprehend. In that situation, the focus lies upon the information known to the officer who made the broadcast. While this does not mandate that he testify, the State must nevertheless present evidence justifying said officer's broadcast or request; in other words, it must be shown that the officer who made the stop or arrest did so upon the request of someone who had reasonable suspicion or probable cause. It is not enough to merely show that a stop was made because another officer requested it.

*State v. Jennings,* 958 S.W.2d 930, 933 (Tex.App.–Amarillo 1997, no pet.) (citations omitted); *see Kirby v. State,* No. 06–10–00138–CR, 2011 WL 61731, at *2 (Tex. App.–Texarkana Jan. 6, 2011, no pet.) (mem. op., not designated for publication) [7] (quoting *Jennings,* 958 S.W.2d at 933) (citations omitted).

Here, the State asserted that Foreman had reasonable suspicion that Boyett was "carry[ing] supplies that are involved in . . . the manufacture of methamphetamine." We agree. Specifically, we conclude that the information provided to Foreman by Amis, together with the information observed by Foreman corroborating the information provided by Amis, constituted reasonable suspicion justifying Foreman's stop of the Boyetts' vehicle and questioning of them about their activities.

Boyett's detention resulted from what is essentially a profile of methamphetamine manufacturers from Oklahoma making "pill runs" to Paris, Texas. Although reasonable suspicion cannot be based on the

---

7. Although this unpublished case has no precedential value, we may take guidance from it "as an aid in developing reasoning that may

be employed." *Carrillo v. State,* 98 S.W.3d 789, 794 (Tex.App.—Amarillo 2003, pet. ref'd).

mere existence of a profile, where the pro-filed behavior is unusual and the investigating officer can satisfactorily explain why the behavior is suspicious, behavior conforming to the profile can form the basis of reasonable suspicion. The United States Supreme Court outlined the parameters of reasonable suspicion based on "drug courier profiles" in two cases.[8]

In *Reid v. Georgia*, the defendant was detained by a DEA agent based on a "drug courier profile," which the court described as "a somewhat informal compilation of characteristics believed to be typical of persons unlawfully carrying narcotics." *Reid v. Georgia*, 448 U.S. 438, 440, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam). The Supreme Court held that the detention was illegal because it was not supported by reasonable suspicion. *Id.*

> We conclude that the agent could not as a matter of law, have reasonably suspected the petitioner of criminal activity on the basis of these observed circumstances. Of the evidence relied on, only the fact that the petitioner preceded another person and occasionally looked backward at him as they proceeded through the concourse relates to their particular conduct. The other circumstances describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure.... Although there could, of course, be circumstances in which wholly lawful conduct

might justify the suspicion that criminal activity was afoot, this is not such a case.

*Id.* at 441, 100 S.Ct. 2752 (citation omitted).

Later, in *Sokolow* the United States Supreme Court found reasonable suspicion based on otherwise lawful conduct even though the officers' attention was drawn to the defendant on the basis of a "drug courier profile."

> We do not agree with respondent that our analysis is somehow changed by the agents' belief that his behavior was consistent with one of the DEA's "drug courier profiles." A court sitting to determine the existence of reasonable suspicion must require the agent to articulate the factors leading to that conclusion, but the fact that these facts may be set forth in a "profile" does not somehow detract from their evidentiary significance as seen by a trained agent.

*Sokolow*, 490 U.S. at 10, 109 S.Ct. 1581. The Court also noted that " 'innocent behavior will frequently provide the basis for a showing of probable cause' " and that " '[i]n making a determination of probable cause[9] the relevant inquiry is not whether particular conduct is "innocent" or "guilty," but the degree of suspicion that attaches to particular types of noncriminal acts.' " *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 243–44 n.13, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). Justice Marshall dissented and cautioned against "[r]eflexive reliance on a profile of drug courier char-

---

8. Technically, a "drug courier profile" is a phrase which applies to a specific category of people who transport narcotics via public transportation from the place of manufacture to another location where it will be sold. Here, the Boyetts were not transporting narcotics, but their actions in purchasing pseudoephedrine in order to manufacture methamphetamine fit a "profile" of methamphetamine manufacturers engaged in "pill

runs." Thus, the same principles apply to this profile that apply to "drug courier profiles."

9. Although the Court for *Sokolow* addressed reasonable suspicion rather than probable cause, it also held that the cited rule "applies equally well to the reasonable suspicion inquiry." *Sokolow*, 490 U.S. at 10, 109 S.Ct. 1581.

acteristics" noting that such reliance "runs a far greater risk than does ordinary, case-by-case police work of subjecting innocent individuals to unwarranted police harassment and detention," which "is enhanced by the profile's 'chameleon-like way of adapting to any particular set of observations.'" *Id.* at 13, 109 S.Ct. 1581 (Marshall, J., dissenting).[10]

 Accordingly, when *Reid, Sokolow,* and Justice Marshall's dissenting opinion in *Sokolow* are read together, they demonstrate that a profile which is so broad that it describes behavior common to everyone will not support reasonable

suspicion, but the fact that a person is detained because he fits a profile will not negate reasonable suspicion either. The existence of a profile neither adds nor subtracts from the reasonable suspicion. Instead, the key inquiry is whether "the State produces evidence explaining the basis for and significance of the profile and the specific significance attributed by the officer to the circumstances' consistency with the profile...." George E. Dix, et al., 40 *Texas Practice, Criminal Practice & Procedure* § 13:70 (3d ed.2011). "This may be taken into account as adding to the weight properly attributed to the circumstances relied upon by the officer." *Id.*[11]

---

**10.** Justice Marshall cited to a collection of cases demonstrating this danger.

> Compare, *e.g., United States v. Moore,* 675 F.2d 802, 803 (CA6 1982) (suspect was first to deplane), *cert. denied,* 460 U.S. 1068, 103 S.Ct. 1521, 75 L.Ed.2d 945 (1983), with *United States v. Mendenhall,* 446 U.S. 544, 564, 100 S.Ct. 1870, 1882, 64 L.Ed.2d 497 (1980) (last to deplane), *with United States v. Buenaventura–Ariza,* 615 F.2d 29, 31 (CA2 1980) (deplaned from middle); *United States v. Sullivan,* 625 F.2d 9, 12 (CA4 1980) (one-way tickets), *with United States v. Craemer,* 555 F.2d 594, 595 (CA6 1977) (round-trip tickets), *with United States v. McCaleb,* 552 F.2d 717, 720 (CA6 1977) (nonstop flight), *with United States v. Sokolow,* 808 F.2d 1366, 1370 (CA9), *vacated,* 831 F.2d 1413 (1987)) (case below) (changed planes); *Craemer, supra,* at 595 (no luggage), *with United States v. Sanford,* 658 F.2d 342, 343 (CA5 1981) (gym bag), *cert. denied,* 455 U.S. 991, 102 S.Ct. 1618, 71 L.Ed.2d 852 (1982), *with Sullivan, supra,* at 12 (new suitcases); *United States v. Smith,* 574 F.2d 882, 883 (CA6 1978) (traveling alone), *with United States v. Fry,* 622 F.2d 1218, 1219 (CA5 1980) (traveling with companion); *United States v. Andrews,* 600 F.2d 563, 566 (CA6 1979) (acted nervously), *cert. denied sub nom. Brooks v. United States,* 444 U.S. 878, 100 S.Ct. 166, 62 L.Ed.2d 108 (1979), *with United States v. Himmelwright,* 551 F.2d 991, 992 (CA5) (acted too calmly), *cert. denied,* 434 U.S. 902, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977).

*Sokolow,* 490 U.S. at 13–14, 109 S.Ct. 1581 (Marshall, J., dissenting).

**11.** The problem with basing reasonable suspicion on the mere existence of a profile is that it could allow an investigating officer to convert ordinary, nonsuspicious behavior into reasonable suspicion by merely testifying that the behavior fits a profile. Therefore, the existence of reasonable suspicion does not depend on the existence of a "profile." Rather, the existence of reasonable suspicion depends on whether the behavior observed is unusual (although, not necessarily illegal) and whether the officer can explain why it is suspicious. For example, in *Reid,* the behavior observed by the officers was not unusual and did not constitute reasonable suspicion even though the officers testified that it fit a profile. The Supreme Court noted that the lower court

> thought it relevant that (1) the petitioner had arrived from Fort Lauderdale, which the agent testified is a principal place of origin of cocaine sold elsewhere in the country, (2) the petitioner arrived in the early morning, when law enforcement is diminished, (3) he and his companion appeared to the agent to be trying to conceal the fact that they were travelling together, and (4) they apparently had no luggage other than their shoulder bags.

*Reid,* 448 U.S. at 440–41, 100 S.Ct. 2752. There was nothing unusual about this behavior. It could have applied to virtually every passenger on the flight from Fort Lauderdale who had carry-on luggage. By contrast, in *Sokolow,* the behavior observed by the officers was unusual for most people.

> When respondent was stopped, the agents knew, *inter alia,* that (1) he paid $2,100 for

In the present case, several factors stand out which provide the additional information necessary to bridge the gap between the mere "reflexive reliance on a profile of drug courier characteristics" cautioned against in *Sokolow* and reasonable suspicion. First, the behavior observed was unusual. A specific category of individuals—groups of two or more Oklahoma residents who traveled together to Paris, Texas—purchased a very specific product—pseudoephedrine—in a very specific but unusual manner—each member of the group purchasing pseudoephedrine at a different store or pharmacy within a short period of time. While it is possible that a group of two or more innocent people from Oklahoma might travel together to Paris, Texas, and purchase only pseudoephedrine at separate pharmacies within a short period of time, it would be unusual.

Second, the testimony established that Amis suspected the Boyetts were engaging in "pill runs" based on *prior* purchases. As mentioned above, Amis had previously flagged the Boyetts on his computer program because they had the same address on their drivers' licenses and had been buying pseudoephedrine at different pharmacies in Paris within a short period of time. And Foreman testified that Amis had told him that "[a]fter observing their buying pattern, he had thought that it was suspicious, and he had flagged them to where he would be notified every time they bought." [12] The fact that the Boyetts engaged in this unusual behavior previously makes it even less probable that it was a random, innocent occurrence when it was repeated on this occasion.

Third, when his computer program notified him that Jessica had purchased pseudoephedrine on the occasion in question, Amis did not ask Foreman to go to the CVS Pharmacy where she had purchased the pseudoephedrine and detain or arrest them. Instead, he asked Foreman to go to the *other* CVS Pharmacy to see if Boyett would attempt to purchase pseudoephedrine at *that* location. Although corroboration is not required when an officer receives information from another officer, Foreman had corroboration when he trav-

two airplane tickets from a roll of $20 bills; (2) he travelled under a name that did not match the name under which his telephone number was listed; (3) his original destination was Miami, a source city for illicit drugs; (4) he stayed in Miami for only 48 hours, even though a round-trip flight from Honolulu to Miami takes 20 hours; (5) he appeared nervous during his trip; and (6) he checked none of his luggage. *Sokolow*, 490 U.S. at 3, 109 S.Ct. 1581. It would be unusual for a person to pay $2,100.00 in cash for two airline tickets from a roll of $20.00 bills, or to travel under a name that does not match his telephone number, or to travel twenty hours from Honolulu, Hawaii, to Miami, Florida, with only carry-on luggage, or to travel from Honolulu to Miami and then return to Honolulu forty-eight hours later, but the fact that someone did all of those things on the same trip was especially unusual and suspicious. Therefore, even though *Reid* and *Sokolow* both involved behavior described by a drug courier profile,

only that behavior which was unusual constituted reasonable suspicion. Unusual behavior which is typically associated with drug couriers might fit a profile, but the factor that converts that behavior into reasonable suspicion is not that it fits a profile, but that it is unusual and that the officer can explain why it is suspicious.

12. While we are not told how many pseudoephedrine purchases the Boyetts had made in the past, how often the purchases were made, how much pseudoephedrine they purchased on those occasions, or the length of time over which those prior purchases occurred, these details are not essential because Amis and Foreman merely used that information to flag the Boyetts for further observation. Thus, this is not a case where the officers observed behavior and then immediately shoe-horned that behavior into a profile; rather, they observed the behavior and waited to see if it would be repeated.

eled to the second CVS Pharmacy and Boyett's pickup truck was present at that location, which tended to confirm Amis' hypothesis that the Boyetts were on a "pill run," a pattern with which Foreman was familiar.[13] Foreman further testified, "I knew that [the Boyetts] both made a purchase that . . . I was investigating." Amis predicted the Boyetts' future behavior based on his observation of their past behavior. Accordingly, the behavior observed here was not only unusual in and of itself, the fact that it was repeated made it even more unusual.

Fourth, even then, Foreman did not detain the Boyetts, but put them under further surveillance to see what they would do next. As a result of that surveillance, the officers watched the Boyetts travel to two specific locations—The Home Depot and Walmart—that sold the other items they needed to manufacture methamphetamine. And one of those locations, Walmart, also had a pharmacy that sold pseudoephedrine. This behavior was also consistent with the factors identified by Foreman as typical of people involved in "pill runs." It is certainly possible that an innocent person might shop at a CVS Pharmacy, The Home Depot, and Walmart all in the same day, but given the information possessed by Foreman and Amis by that time, the probabilities that the Boyetts did so innocently were substantially diminished. Finally, when they were eventually stopped, the Boyetts

were on the highway that lead back to Oklahoma and were headed in that direction.

■■■ As the Supreme Court stated in *Sokolow*, "Any one of these factors is not by itself proof of any illegal conduct and is quite consistent with innocent travel. But we think taken together they amount to reasonable suspicion." *Sokolow*, 490 U.S. at 9, 109 S.Ct. 1581. Moreover, " '[i]n making a determination of probable cause[,] the relevant inquiry is not whether particular conduct is "innocent" or "guilty," but the degree of suspicion that attaches to particular types of noncriminal acts.' " *Id.* at 10, 109 S.Ct. 1581 (quoting *Gates,* 462 U.S. at 243–44 n. 13, 103 S.Ct. 2317). Given the specific and unique character of the factors relied upon by Amis and Foreman and the fact that those patterns were anticipated, predicted, and repeated leads us to conclude that Foreman had reasonable suspicion based on specific, articulable facts that, in light of his experience and general knowledge, would lead him to reasonably conclude that the Boyetts were, had been, or soon would be engaged in criminal activity.[14]

### E. Foreman Had Probable Cause to Search the Vehicle

■■■ Next, an officer may search any area of a vehicle "[i]f there is probable cause to believe a vehicle contains evidence of criminal activity.' " *Arizona v. Gant,*

---

**13.** *See Pipkin v. State,* 114 S.W.3d 649, 654 (Tex.App.–Fort Worth 2003, no pet.) ("Corroboration by the law enforcement officer of any information related by the informant may increase the reliability of the information.").

**14.** We do not hold that the mere purchase of pseudoephedrine from separate pharmacies in the same city in a short period of time is reasonable suspicion that a person is engaged in the manufacture of methamphetamine. Likewise, we do not hold that a purchase of pseudoephedrine followed by a trip to a retail

building materials store is reasonable suspicion in and of itself. We only hold that in this case, those actions, combined with the facts that the Boyetts (1) had previously made such purchases, (2) were being monitored to see if the conduct would be repeated, (3) actually repeated the behavior, and then (4) acted as the monitoring officer predicted they would based on his experience with previous "pill run" cases was reasonable suspicion to justify the stop.

556 U.S. 332, 347–48, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009); *Harris*, 468 S.W.3d at 255 (quoting *Gant*). "Probable cause for a search exists where the facts and circumstances within the knowledge of the officer on the scene and of which he has reasonably trustworthy information would lead a man of reasonable caution and prudence to believe that he will find the instrumentality of a crime or evidence pertaining to a crime." *Brown v. State*, 481 S.W.2d 106, 110 (Tex.Crim.App.1972); *see Moulden v. State*, 576 S.W.2d 817, 819 (Tex.Crim.App. [Panel Op.] 1978) (quoting *Brown*); *see also Harris*, 468 S.W.3d at 255 (quoting *Moulden*).

▮ In describing probable cause to search, the Supreme Court has held,

"Probable cause exists where 'the facts and circumstances within [an officer's] knowledge and of which [he] had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed," *Brinegar v. United States*, 338 U.S. 160, 175–176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949) (quoting *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925)), and that evidence bearing on that offense will be found in the place to be searched.

*Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 370, 129 S.Ct. 2633, 174 L.Ed.2d 354 (2009). Moreover, "[p]erhaps the best that can be said generally about the required knowledge component of probable cause for a law enforcement officer's evidence search is that it raise a 'fair probability' or a 'substantial chance' of discovering evidence of criminal activity." *Id.* at 371, 129 S.Ct. 2633 (quoting *Gates*, 462 U.S. at 238, 244 n. 13, 103 S.Ct. 2317).

As noted above, Foreman already knew that Boyett had purchased pseudoephedrine. When Foreman asked Boyett if he used methamphetamine, Boyett admitted that he did. Foreman knew that Boyett had traveled to two other stores which sold products necessary to manufacture methamphetamine. When Foreman asked him if he had in his possession any substances used to manufacture methamphetamine, Boyett stated that he had liquid heat. Looking at these facts under the totality of the circumstances, we conclude that Foreman had probable cause justifying his search of Boyett's vehicle for substances related to the manufacture of methamphetamine.

Because we determine that Foreman had reasonable suspicion to stop the Boyetts and probable cause to search their vehicle, we overrule Boyett's first point of error.

## III. Boyett Failed to Establish that the Trial Court Abused its Discretion in Denying Boyett's Motion to Suppress His Audio/Video–Recorded Statement

▮ In his second point of error, Boyett argues that the trial court should have suppressed his audio/video-recorded statement because it was obtained as a result of an illegal arrest and was coerced. Because we have already concluded that the confession was not obtained as a result of an illegal seizure or search, we focus our attention on whether the confession was coerced.

After administering *Miranda*[15] warnings, Foreman and Detective Tommy Moore interviewed Jessica on the evening of the arrest. In her first interview, Jessica admitted that she used methamphetamine intravenously and that she had used

---

15. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

the drug the day before her arrest, but she denied ever cooking or selling the drug. Because she became concerned that she was saying too much, Jessica decided to terminate the interview at 10:34 p.m. after approximately thirty minutes. After a short break and more persuasive and persistent questioning, Jessica's second interview yielded information that Boyett cooked methamphetamine on their Oklahoma property for their personal consumption and that the liquid heat, peroxide, and pseudoephedrine that they were transporting were going to be used to make methamphetamine.

Boyett was placed "on hold" at the police department during Jessica's interviews. On the following morning, Foreman and Moore interviewed Boyett after administering *Miranda* warnings. After Foreman disclosed that Jessica's interview was fruitful, Boyett admitted that he used methamphetamine, that he used the red phosphorous method of cooking methamphetamine, and that the items found in the truck were going to be used to make methamphetamine.

During the hearing on Boyett's suppression motion, Jessica testified that after they had been transported to the police department, Moore threatened her and would not allow her to call a lawyer. According to Jessica, Moore stated that she would go to jail for ten years and would not be able to see her step-children or go home until she cooperated with him and told him what he wanted to hear. Boyett also testified that he asked for a lawyer many times while he was placed "on hold" overnight, but that he was repeatedly denied the opportunity to contact a lawyer. According to Boyett, Foreman threatened civil forfeiture proceedings against the truck and told him that he would not get the truck back unless he confessed to wrongdoing during the interview. Fore-

man denied that he threatened or coerced Jessica or Boyett and stated that they did not unequivocally ask for an attorney.

In its findings of fact, the trial court found that Boyett admitted that the pseudoephedrine in his possession was "intended for the purpose of making methamphetamine" and that Boyett's and Jessica's testimony that Foreman and Moore threatened them and denied them their right to counsel was not credible. The trial court further found that the recorded statements were admissible.

 " '[T]he true test of admissibility is that the confession is made freely, voluntarily and without compulsion or inducement of any sort.' " *Harty v. State,* 229 S.W.3d 849, 855 (Tex.App.–Texarkana 2007, pet. ref'd) (quoting *Haynes v. Washington,* 373 U.S. 503, 513, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963)). "Whether the statement was obtained by coercion or improper inducement must be determined under the totality of the circumstances." *Id.* "A confession is coerced if the defendant's will was overborne by the circumstances surrounding the confession." *Id.* (citing *Dickerson v. United States,* 530 U.S. 428, 434, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000); *Schneckloth v. Bustamonte,* 412 U.S. 218, 225–26, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). " '[T]he trial court is the "sole and exclusive trier of fact and judge of the credibility of the witnesses" and the evidence presented at a hearing on a motion to suppress, particularly where the motion is based on the voluntariness of a confession.' " *Colvin v. State,* 467 S.W.3d 647, 657 (Tex.App.–Texarkana 2015, pet. ref'd) (quoting *Delao v. State,* 235 S.W.3d 235, 238 (Tex.Crim.App.2007) (citations omitted)).

The recorded statement demonstrates (1) that Boyett was issued *Miranda* warnings, which he acknowledged and claimed that he understood, (2) that Boyett never

indicated that he wanted to speak with a lawyer during the interrogation, (3) that the interrogation was conducted in a calm manner, and (4) that Boyett was relatively quick to confess after hearing that Jessica had admitted that they used methamphetamine. Although Boyett claimed that Foreman threatened civil forfeiture proceedings against the truck, the recording contains no information substantiating this claim. As the sole judge of witness credibility, the trial court determined that Boyett's testimony was not credible and that he had informed Foreman during the traffic stop that he smoked methamphetamine, diminishing Boyett's claim that the custodial interrogation yielded a confession due to any threat. Based on the record before us, we cannot conclude that the trial court abused its discretion in determining that Boyett's will was not overborne by the circumstances of his confession. Thus, we overrule Boyett's second point of error.

## III. Boyett Cannot Challenge the Sufficiency of the Evidence Supporting His Plea

 In his last point of error, Boyett challenges the sufficiency of the evidence supporting his guilty plea. Rule 25.2(a)(2) of the Texas Rules of Appellate Procedure states, "In a plea bargain case ... a defendant may appeal only: (A) those matters that were raised by written motion filed and ruled on before trial, or (B) after getting the trial court's permission to appeal." Tex.R.App. P. 25.2(a)(2). The appellate record and the trial court's certification of defendant's right of appeal are clear that, in this plea bargain case, Boyett reserved only the right to appeal the trial court's ruling on pretrial matters. Thus,

we must dismiss this portion of Boyett's appeal for want of jurisdiction.[16] *See Chavez v. State*, 183 S.W.3d 675, 680 (Tex. Crim.App.2006).

## IV. Conclusion

We affirm the trial court's judgment.

### Dissenting Opinion by Justice Moseley

The majority correctly states that in the absence of a warrant, the burden in the suppression hearing in the Boyett case is on the State to prove that it had the right to stop a vehicle. Here, the State claimed two reasons: (1) that police officers entertained reasonable suspicion of criminal activity and (2) that the law enforcement officers observed criminal activity, which prompted the stop. Therefore, in addition to analyzing the rationale for that claimed reasonable suspicion, this dissent must also discuss whether Leigh Foreman, the Paris police officer who testified, was justified in having stopped the Boyett vehicle based on his observation of a traffic violation. Here, unless the law enforcement officers established one of these two reasons to have stopped the Boyett vehicle as it progressed along its way, the State's entire case fails.

The majority opinion relies heavily on the collective knowledge of the law enforcement officers who were involved in the investigation leading to the stop and search of the vehicle and the arrest of the Boyetts. It appears that Lieutenant Anson Amis of the Lamar County Sheriff's Department was the peace officer who possessed most of the knowledge precipitating the traffic stop.[17]

---

16. Boyett raises additional arguments regarding Jessica's statements which were not raised before the trial court. He has failed to preserve these issues for our review. *See* Tex.R.App. P. 33.1.

17. Although Amis was present at the courtroom at the outset of the suppression hearing and was placed under the rule, thereby making it necessary for him to be absent from the courtroom during Foreman's testimony, he

Evidence presented subsequent to the suppression hearing reveals that Amis apparently had been following the activities of the Boyetts for quite some time and was being supplied with "real time" evidence via computer when either of the Boyetts purchased pseudoephedrine in Lamar County. The problem is that Foreman failed to testify with sufficient precision about the relevant matters that may have been fodder for reasonable suspicion for the traffic stop. His testimony about what he knew at the time the traffic stop was effected is what is important here—not the results of the ensuing conversation that Foreman had with Boyett or the fruits of the subsequent search.[18]

The majority points out that Foreman testified, "Especially in this case since I knew that he and her both made a purchase that were under—I was investigating...." But precisely what purchases was Foreman investigating? In other portions of his testimony, Foreman identified Coleman camp fuel, pseudoephedrine cold packs, liquid heat, Drano products, coffee filters, rubber tubing, and peroxide as being among the things which were used in the manufacture of methamphetamine and which were, presumably, objects of his investigation. He also opined that Walmart and The Home Depot (retail establishments other than the CVS Pharmacy where he observed the Boyetts' vehicle) sold things that could be used in the manufacture of methamphetamine. Foreman did not testify that he knew that both of the Boyetts had purchased pseudoephedrine when the stop was made. He does not specify what things he knew the Boyetts to have purchased; he may have been making reference to coffee filters (he testified that he was "investigating" that kind of purchase as well) and not pseudoephedrine.[19] One notices that Walmart and The Home Depot—places the police observed the Boyettes had stopped—also sell paint, light switches, door locks, and other things which would not ordinarily be used for the purpose of manufacturing illicit drugs. Walmart also sells cloth baby diapers; could cloth baby diapers have been used to strain some of the liquids during the process of manufacturing methamphetamine? The State observed that Walmart also sells pseudoephedrine, but there was no evidence known by the police before the traffic stop that the Boyetts purchased any of it while they were under surveillance by the police.[20]

Foreman testified that his experience showed that it was common for people on a "pill run" to also purchase other equipment used in the manufacture of methamphetamine. He failed to mention that it is also commonplace for people who come from smaller cities (like Rattan, Oklahoma, the home of the Boyetts) to a larger shopping area (such as Paris, Texas) to shop at more than one store. This would be com-

---

was never thereafter called as a witness to the other activities of the Boyetts.

18. The results of that search somewhat illustrates the dilemma faced by a person such as me. The search and other subsequently divulged information that the Boyetts were almost certainly engaged in the manufacture of methamphetamine. However, the later-revealed information does nothing to provide cover for what I believe is a violation of the rights of citizens of our country, irrespective of their guilt or innocence.

19. As an aside, it is no more illegal to purchase pseudoephedrine than it is to purchase coffee filters.

20. After the traffic stop, under questioning by the police, Boyett stated that they had purchased pseudoephedrine at Walmart. Foreman did not believe this because of the "real time" computer monitoring available to Amis.

mon to almost everyone living in a small community. . .

Summarizing, the State established that at the time of the decision to effect a stop of the Boyett vehicle, the police had information (1) that the Boyetts were husband and wife and lived together in Rattan, Oklahoma, (2) that Jessica had purchased pseudoephedrine at one of the Paris CVS Pharmacy locations, (3) that the Boyetts and their vehicle were located shortly thereafter at another CVS Pharmacy, (4) that the Boyetts stopped at Walmart and at The Home Depot, (5) that Jessica had purchased something that Foreman was investigating, and (6) that the Boyett vehicle crossed over a lane marker.

In short, although the State may have had a witness available (Amis) who might have been able to testify about activities by the Boyetts which may have given evidence of the reasonable suspicion for the traffic stop which led to their arrest, Amis was never called as a witness. Oddly, no hearsay objection was ever lodged to Foreman's testimony concerning what Amis had told him.[21] Even with the use of hearsay testimony, Foreman never testified sufficiently regarding the pool of knowledge held by the investigating officers to establish reasonable suspicion for the traffic stop.

Put totally innocent people in the place of the Boyetts. Forget that later information showed that the investigating police had more information about the activities of the Boyetts than was developed at the suppression hearing. The objects of the stop would, from the evidence elicited at the suppression hearing, bear no more guilt than many private citizens who suffered from a cold and went to more than one drug store. There is nothing to show that the Boyetts' stop at the second CVS store was not merely an attempt to purchase a beach ball which the first CVS store had advertised but which was no longer available there. The thin veneer applied to the reasoning for the traffic stop of the Boyett vehicle bodes ill for innocent citizens who would purchase any of the myriad things which are used in the manufacture of methamphetamine.

Because "[n]o evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case,"[22] all of the evidence arising after that traffic stop should have been excluded if the sole basis of that stop was because of the reasonable suspicion of the police.

Although it is not discussed in the majority opinion, if we determine that the traffic stop was not prompted by reasonable suspicion, we must examine the statement by the testifying officer that he waited until he observed a traffic violation before pulling over the Boyetts, this being his initial justification for the traffic stop. Foreman, the sole witness for the State at the suppression hearing, testified, "I observed a traffic violation where they failed to maintain a single lane, which is described as vehicles left side tires—they were in the right lane, and the vehicles left side tires crossed over the center line into the left lane before going back." However, at no point did Foreman testify that any danger resulted from the wayward path of the vehicle.

---

21. Granted the Rules of Evidence, except with respect to privileges, do not apply in suppression hearings. *Vennus v. State,* 282 S.W.3d 70, 72 n. 1 (Tex.Crim.App.2009)

22. TEX.CODE CRIM. PROC. ANN. art. 38.23 (West 2005).

Clearly, improperly crossing a lane is an act that only under some circumstances may be prohibited by the Texas Transportation Code. Tex. Transp. Code Ann. § 545.060(a) (West 2011). This traffic law requires a driver on a roadway with clearly marked lanes to "drive as nearly as practical entirely within a single lane" and to "not move from the lane unless that movement can be made safely." *Id.* In order to prove that a violation of this provision has occurred, the text of the statute plainly requires the State to show that a lane line encroachment has created an unsafe situation. The Texas Court of Criminal Appeals observed that "the average driver occasionally strays over the side stripe of the road." *Corbin v. State,* 85 S.W.3d 272, 277 (Tex.Crim.App.2002).

However, simply straying over the stripe of the road does not trigger a violation of the law. The violation "occurs only when a vehicle fails to stay within its lane *and* such movement is not safe or is not made safely." *Hernandez v. State,* 983 S.W.2d 867, 871 (Tex.App.–Austin 1998, pet. ref'd). The requirement of showing the coupling of the straying over the marked lines to some evidence of danger to the driver or others brought about by those lane violations has been accepted by other courts, and its absence has resulted in an ensuing traffic stop having been determined to not be justified. *Fowler v. State,* 266 S.W.3d 498, 499 (Tex.App.–Fort Worth 2008, pet. ref'd); *Eichler v. State,* 117 S.W.3d 897, 901 (Tex.App.–Houston [14th Dist.] 2003, no pet.) *State v. Cerny,* 28 S.W.3d 796, 799 (Tex.App.–Corpus Christi 2000, no pet.); *State v. Arriaga,* 5 S.W.3d 804, 807 (Tex.App.–San Antonio 1999, pet. ref'd); *State v. Tarvin,* 972 S.W.2d 910, 912 (Tex.App.–Waco 1998, pet. ref'd). This Court has held likewise. *Bass v. State,* 64 S.W.3d 646, 651 (Tex. App.–Texarkana 2001, pet. ref'd) (no reasonable suspicion to stop defendant who swerved within his lane line and crossed it some unknown number of times over two to three mile stretch).

Even though Foreman testified that he did not institute a stop of the Boyett vehicle until after the vehicle had exited an area of heavy traffic, he never characterized the weaving of that vehicle to have created a dangerous situation. Not having done so, there was no showing that there was a violation of the law that prompted the traffic stop. Since there was no violation shown, the Boyett truck's straying across the lane marker provided the officers no cause to institute a traffic stop.

Once that evidence obtained as a result of the traffic stop is barred, the State's case falls like an overripe fruit from a tree.

This being the case, I dissent and believe that the conviction should be reversed.